**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | |
|---|---|
| CHUNG CHUI WAN, ) | |
| ) | |
| Petitioner, ) | |
| ) | Case Number: 3:20-cv-3233 |
| v. ) | |
| ) | |
| MICHEL DALE DEBOLT, ) | |
| ) | |
| Respondent. ) | |

**RESPONDENT'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

Now comes Respondent, MICHEL DALE DEBOLT ("**Michel**"), by and through his attorneys, Beermann LLP, and pursuant to Fed. R. Civ. P. 12(b)(6), submits the following memorandum in support of his Motion to Dismiss Petitioner's *Verified Complaint and Petition for Return of the Minor Children in Accordance with the Hague Convention and Motion for Expedited Return and Hearing, Instanter* ("**Hague Petition**") for failure to state a cause of action:

**INTRODUCTION**

By the time Petitioner filed her Hague Petition on September 8, 2020, two of the three separate, co-equal branches of the United States government had declared an end to the Hong Kong Special Administrative Region's autonomy from the People's Republic of China (the "PRC") and the Chinese Communist Party which controls it. Notwithstanding the PRC's lip service to a "one country, two systems" policy, under which Hong Kong would retain its current lifestyle and legal, social, and economic systems until at least the year 2047, recent events—and the Federal Government's response to those events—demonstrate that Hong Kong is, for all intents and purposes, indistinguishable from mainland China. Thus, insofar as Hong Kong can no longer be considered autonomous from the PRC, and insofar as the PRC is not a signatory to the Hague

Convention on the Civil Aspects of International Child Abduction ("**Hague Convention**"), the fundamental premise of Petitioner's Hague Petition—that the Hague Convention applies to Hong Kong—is no longer tenable. As such, her Hague Petition must be dismissed with prejudice.

## BACKGROUND

### The Hague Convention and U.S. – Hong Kong Relations

1.  On April 29, 1988, the United States ratified the Hague Convention and became a "Contracting State" effective July 1, 1988. *See* Executive Order No. 12648, 53 Fed.Reg. 30637 (1988). Also on April 29, 1988, Congress enacted the International Child Abduction Remedies Act ("**ICARA**"), 22 U.S.C. §§9001 *et seq.* (2014), to implement the Hague Convention in the United States. *See* Hague International Child Abduction Convention; Text and Legal Analysis, 51 FR 10494-10516 (1986).

2.  On October 5, 1992, Congress enacted the United States–Hong Kong Policy Act ("**USHKPA**"), which governs US Policy towards Hong Kong. Section 5701 of the USHKPA provides, in relevant part, as follows:

    > (b) The Hong Kong Special Administrative Region of the People's Republic of China, beginning on July 1, 1997, will continue to enjoy a high degree of autonomy on all matters other than defense and foreign affairs.
    >
    > (c) There is provision for implementation of a "one country, two systems" policy, under which Hong Kong will retain its current lifestyle and legal, social, and economic systems until at least the year 2047.
    > 22 U.S.C.A. § 5701

3.  The USHKPA further provides as follows:

    > The United States should continue to fulfill its obligations to Hong Kong under international agreements, *so long as Hong Kong reciprocates, regardless of whether the People's Republic of China is a party to the particular international agreement, unless and until*

> *such obligations are modified or terminated in accordance with law*.
> (Emphasis added.)
> 22 U.S.C.A. § 5712

4. Section 5721 provides that the US will continue to abide by its international treaties with Hong Kong unless and until the President determines that it is not competent to do so, as follows:

> (b) International agreements For all purposes, including actions in any court in the United States, the Congress approves the continuation in force on and after July 1, 1997, of all treaties and other international agreements, including multilateral conventions, entered into before November 27, 2019, between the United States and Hong Kong *** unless or until terminated in accordance with law. If in carrying out this subchapter, the President determines that Hong Kong is not legally competent to carry out its obligations under any such treaty or other international agreement, or that the continuation of Hong Kong's obligations or rights under any such treaty or other international agreement is not appropriate under the circumstances, such determination shall be reported to the Congress in accordance with section 5731 of this title.
> 22 U.S.C.A. § 5721

5. Section 5731 of the USHKPA requires the United States Secretary of State to issue an annual report on conditions in Hong Kong of interest to the United States. 22 U.S.C.A. § 5731.

6. On September 1, 1997, Hong Kong became a signatory to the Hague Convention.[1]

### Recent Developments

7. On May 22, 2020, the National People's Congress of the People's Republic of China (its legislature) took up a proposal, ultimately approved, regarding the establishment and improvement of "the Legal System and Enforcement Mechanisms for the Hong Kong Special Administrative Region to Safeguard National Security."[2] This proposal would ultimately become

---

[1] https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last accessed September 29, 2020).
[2] CONGRESSIONAL RESEARCH SERVICE, CHINA'S NATIONAL SECURITY LAW FOR HONG KONG: ISSUES FOR CONGRESS, p. 7 (August 3, 2020) (available at https://crsreports.congress.gov/product/pdf/R/R46473) (hereinafter "**CRS REPORT**").

*The Law of the People's Republic of China on Safeguarding National Security in the Hong Kong Special Administrative Region*, colloquially known as the National Security Law ("**NSL**").

8. In direct response to this proposal, the United States Secretary of State, on May 27, 2020, informed Congress, pursuant to section 5731 of the USHKPA, of his certification that Hong Kong did not continue to warrant treatment under U.S. law in the same manner as before its handover to the PRC on July 1, 1997. In support of this conclusion, Secretary Pompeo cited, among other things, the threat the proposed NSL posed to "fundamental principles of autonomy and the long-established practice of Hong Kong courts exercising the power of judicial review to adjudicate laws and review government actions."[3]

9. Two days later, on May 30, 2020, President Trump stated that his Administration would eliminate "different and special treatment" for Hong Kong. He said the United States' new approach would "affect the full range of agreements we have with Hong Kong, from our extradition treaty to our export controls on dual-use technologies and more, with few exceptions." He also said the State Department would revise its travel advisory for Hong Kong "to reflect the increased danger of surveillance and punishment by the Chinese state security apparatus."[4]

10. On June 17, 2020, Secretary Pompeo joined his counterparts from the other members of the G-7 (Canada, France, Germany, Italy, Japan, the United Kingdom) plus the High Representative of the European Union in a statement on the NSL. It declared that China's decision to impose a national security law on Hong Kong "is not in conformity with the Hong Kong Basic Law and its international commitments under the principles of the legally binding, U.N.-registered Sino-British Joint Declaration."[5]

---

[3] https://www.state.gov/2020-hong-kong-policy-act-report/ (last accessed September 29, 2020).
[4] CRS REPORT at 33(citing The White House, "Remarks by President Trump on Actions Against China," May 30, 2020).
[5] CRS REPORT at 33(citing https://www.state.gov/g7-foreign-ministers-statement-on-hong-kong/).

11. At 11:00 p.m. Hong Kong time on June 30, 2020, the NSL became law in Hong Kong. The law is widely viewed as violating obligations the PRC undertook in the 1984 Joint Declaration on the Question of Hong Kong, a treaty signed with the United Kingdom and registered with the United Nations, insofar as it erodes the "high degree of autonomy" the PRC promised Hong Kong for 50 years, from 1997 to 2047 and undermines the human rights of Hong Kong residents, calls into question the city's continued viability as a global financial and trading hub, and signals the effective end of the PRC's "one country, two systems" policy in Hong Kong.[6]

12. On June 30, Secretary Pompeo stated, "The Chinese Communist Party's decision to impose draconian national security legislation on Hong Kong destroys the territory's autonomy and one of China's greatest achievements," and repeated President Trump's pledge to "eliminate policy exemptions that give Hong Kong different and special treatment, with few exceptions."[7]

13. On July 14, 2020, President Trump signed The Hong Kong Autonomy Act ("**HKAA**"), codifying into law the United States' position that the PRC has broken its promise to provide Hong Kong and her citizens with the "high degree of autonomy" afforded to them under the 1984 Joint Declaration of the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the People's Republic of China on the Question of Hong Kong and the Basic Law of the Hong Kong Special Administrative Region of the People's Republic of China.[8]

14. The HKAA, passed with unanimous consent in both the House and the Senate, contains the following findings:

> (4) Foremost among the obligations of the Government of China to Hong Kong is the promise that, pursuant to Paragraph 3b of the Joint

---

[6] CRS REPORT at 1.
[7] CRS REPORT at 34 (citing https://www.state.gov/on-beijings-imposition-of-national-security-legislation-on-hong-kong/).
[8] Hong Kong Autonomy Act, Pub. L. No. 116-149 (July 14, 2020).

Declaration, "the Hong Kong Special Administrative Region will enjoy a high degree of autonomy, except in foreign and defence affairs which are the responsibilities of the Central People's Government".

\*\*\*

(6) Article 22 of the Basic Law [of the Hong Kong Special Administrative Region of the People's Republic of China] establishes that "No department of the Central People's Government and no province, autonomous region, or municipality directly under the Central Government may interfere in the affairs which the Hong Kong Special Administrative Region administers on its own in accordance with this Law.".

(7) The Joint Declaration and the Basic Law make clear that additional obligations shall be undertaken by China to ensure the "high degree of autonomy" of Hong Kong.
Pub. L. No. 116-149

15. The HKAA further provides that, on "multiple occasions, the Government of China has undertaken actions that have contravened the letter or intent" of its legal obligations to ensure that:

   a. Hong Kong is "vested with executive, legislative and independent judicial power, including that of final adjudication;"[9]

   b. current social and economic systems in Hong Kong will remain unchanged, as so will the life-style;"[10]

   c. Hong Kong citizens will have free exercise of their rights to speech, of the press, of assembly, of association, of travel, of movement, of correspondence, of strike, of choice of occupation, of academic research and of religious belief;[11] and

   d. Hong Kong's government should be the elected via universal suffrage.[12]

16. That same day, on July 14, 2020, President Trump issued Executive Order 13936 on Hong Kong Normalization ("**EO**"). In the EO, the President declared a national emergency based on his determination that, "the situation with respect to Hong Kong, including recent actions

---

[9] Pub. L. No. 116-149, sec. 3, para. 8-9.
[10] Pub. L. No. 116-149, sec. 3, para. 10-11.
[11] Pub. L. No. 116-149, sec. 3, para. 12-13.
[12] Pub. L. No. 116-149, sec. 3, para. 14-15.

taken by the PRC to fundamentally undermine Hong Kong's autonomy, constitutes an unusual and extraordinary threat ... to the national security, foreign policy, and economy of the United States." [13]

17. Among other provisions, the EO contains a clear pronouncement that the United States government will no longer treat Hong Kong as distinct from the PRC:

> *Section 1*. It shall be the policy of the United States to suspend or eliminate different and preferential treatment for Hong Kong to the extent permitted by law and in the national security, foreign policy, and economic interest of the United States.[14]

18. The EO further:

 a. authorizes the imposition of visa restrictions and economic sanctions on individuals determined to have been responsible for the undermining of Hong Kong's autonomy;

 b. suspends certain agreements with Hong Kong regarding extradition of prisoners;

 c. suspends differential treatment for Hong Kong under certain federal statutes; and

 d. eliminates the distinction between Hong Kong and China for purposes of certain visas.

19. On September 14, 2020, the State Department amended its existing travel advisory for Hong Kong, recommending that U.S. citizens "[r]econsider travel to the People's Republic of China (PRC), including the Hong Kong Special Administrative Region (SAR), due to **COVID-19 and arbitrary enforcement of local laws**," (emphasis original) and further warning that:

> Since the imposition of national security legislation on July 1, the PRC unilaterally and arbitrarily exercises police and security power in Hong Kong. The PRC has demonstrated an intention to use this

---

[13] Exec. Order No. 13936, 85 Fed. Reg. 43413 (July 17, 2020) (available at https://www.federalregister.gov/documents/2020/07/17/2020-15646/the-presidents-executive-order-on-hong-kong-normalization).
[14] *Id.*

authority to target a broad range of activities it defines as acts of secession, subversion, terrorism, and "collusion" with foreign countries. The new legislation also covers offenses committed by non-Hong Kong residents or organizations outside of Hong Kong, which could subject U.S. citizens who have been publicly critical of the PRC to a heightened risk of arrest, detention, expulsion, or prosecution. PRC security forces, including the new Office for Safeguarding National Security, now operate in Hong Kong.[15]

20. On the heels of President Trump's EO, Senator Jim Risch, Chairman of the Senate Foreign Relations Committee, issued the following statement confirming the elimination of Hong Kong's preferential treatment under US law:

> The executive order the president signed today means Hong Kong will now be treated like, and subject to the restrictions of, any other city in the People's Republic of China.
> ***
> The United States strongly condemns the CCP's decision to abolish the autonomy of Hong Kong and infringe upon the promised rights and freedoms of the Hong Kong people. It is deeply unfortunate that the CCP has decided to end Hong Kong's autonomy after 23 years, when it agreed to 50 years under the Sino-British Joint Declaration."[16]

## STANDARD FOR DISMISSAL UNDER RULE 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[A] plaintiff seeking to survive a motion to dismiss must "plead some facts that suggest a right to relief that is beyond the speculative level." *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016). "[O]n a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation. Factual allegations must be enough to raise a right to relief above the speculative level."

---

[15] https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/hong-kong-travel-advisory.html (last accessed September 29, 2020).
[16] CHAIRMAN RISCH STATEMENT ON END OF PREFERENTIAL TREATMENT FOR HONG KONG; https://www.foreign.senate.gov/press/chair/release/chairman-risch-statement-on-end-of-preferential-treatment-for-hong-kong (last accessed September 30, 2020).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)(citations omitted).

"A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). It is well-settled that courts may take judicial notice of Executive Orders (*N.L.R.B. v. E.C. Atkins & Co.*, 331 U.S. 398, 406, 67 S. Ct. 1265, 1270, 91 L. Ed. 1563 n. 2 (1947)); acts of Congress (*Hill v. United States*, 149 U.S. 593, 603, 13 S. Ct. 1011, 1015, 37 L. Ed. 862 (1893)); and government websites. *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011).

## ARGUMENT

The foregoing facts lead to one inescapable conclusion: that it is now the explicit policy of the United States that the Hong Kong Special Administrative Region should no longer be considered autonomous from the People's Republic of China.

Insofar as the People's Republic of China is not a signatory to the Hague Convention, and Hong Kong is no longer entitled to "different and preferential treatment" under United States law, Petitioner cannot seek refuge under the provisions of the Hague Convention to compel the return of the parties' children to a forum which is not a signatory to that treaty. Accordingly, she cannot establish a fundamental element of her cause of action and her Petition must be dismissed. See *Didon v. Castillo*, 838 F.3d 313, 326 (3d Cir. 2016) ("Because [child's country of habitual

residence] does not recognize the Hague Convention, the Convention does not apply to this case and the petition must be dismissed"); *Taveras v. Taveraz*, 477 F.3d 767 (6th Cir. 2007) (affirming dismissal of father's Hague Petition for where Dominican Republic was not a signatory to the Hague Convention).

WHEREFORE, Respondent, MICHEL DALE DEBOLT, respectfully requests that this Court dismiss Petitioner's Hague Petition with prejudice.

                        Respectfully Submitted,

                        MICHEL DALE DEBOLT

                        By: /s/Howard W. Feldman
                             One of His Attorneys

| | |
|---|---|
| Shana Vitek | Howard W. Feldman |
| Matthew D. Elster | John S.M. Morse |
| **BEERMANN LLP** | **FELDMAN WASSER** |
| 161 North Clark Street, Suite 3000 | 1307 South 7th Street |
| Chicago, IL   60601 | Springfield, IL 62703 |
| (312) 621-9700 | (217) 544-3403 |
| (312) 621-0909 – Fax | (217) 544-1593 – Fax |
| slvitek@beermannlaw.com | hfeldman@feldmanwasser.com |
| mdelster@beermannlaw.com | jmorse@feldmanwasser.com |

## **CERTIFICATE OF SERVICE**

      I hereby certify that on October 7, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

      Reuben A. Bernick      reuben@bfsfamlaw.com

      Joy M. Feinberg       joy@fsfamlaw.com

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

      Not Applicable

      /s/ Howard W. Feldman  
      Howard W. Feldman #0788066  
      Attorney for Defendant  
      FeldmanWasser  
      1307 S. 7th Street  
      Springfield, IL 62703  
      Telephone: (217) 544-3403  
      Fax: (217) 544-1593  
      E-mail: hfeldman@feldman-wasser.com