## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS,
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CHUNG CHUI WAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case Number: 3:20-cv- |
| v. | ) | 03233 |
| | ) | Judge Sue E. Myerscough |
| MICHEL DALE | ) | |
| DEBOLT, | ) | |
| | ) | |
| Respondent. | | |

## RESPONDENT'S TRIAL BRIEF

Respondent, MICHEL DALE DEBOLT, through his attorneys, BEERMANN LLP and FELDMAN WASSER, submits the following as his trial brief.

## INTRODUCTION

This is not a typical Hague Convention case, in that the petitioner is asking the Court to order the children to be returned to an island locality that is not itself a country, but is classified as an autonomous region of an authoritarian

country—the Peoples Republic of China—that is not a party to the Hague Convention.

While Hong Kong may be a physical island, it is not "autonomous" or separate from mainland China in any true sense of the word. Just ask China, which has repeatedly declared to the world that "***Hong Kong is part of China, and Hong Kong affairs are China's internal affairs***,"[1] In fact, suggesting otherwise anywhere in the world, now indefinitely subjects the person making such a proposition to criminal prosecution in Hong Kong.

Thus, although Wan is *ostensibly* asking the Court to order the return the children to "Hong Kong", she is *in reality* asking the Court to return the children to China, which over the last year or so has swallowed and digested Hong Kong

---

[1] https://www.fmprc.gov.cn/mfa_eng/xwfw_665399/s2510_665401/2535_665405/t1716773.shtml (Foreign Ministry Spokesperson Geng Shuang's Remarks on US Senate Passing Hong Kong Human Rights and Democracy Act).

as thoroughly as a constrictor snake might eat a mouse. Anti-democratic crackdowns, a draconian National Security Law, which intrudes even into primary schools.

While thousands of Hong Kongers have chosen to flee the island for the safe havens of free countries which have opened their doors in the wake of China's crackdown, Wan, counter-intuitively (particularly, give her own anti-Communist views, oft instilled by her into the children), is asking the Court to order the children back to Hong Kong/China. The children are fortunate to be in the United States with their father, who sees the situation in Hong Kong for what it is and what it is fast becoming: a bad situation getting worse faster than we can keep up with the news. When Michel Debolt looks at Hong Kong, he sees an integral part of China. Respectfully, so should the Court.

That said, in considering the risks and dangers to the children inherent in returning to Hong Kong, that Court

should not just look at Hong Kong, and what China is doing to Hong Kong—but at China itself, human rights violations and all.

History is replete with examples of citizens of authoritarian states not seeing the writing on the wall, burying their heads in the sand, only to realize they should have left when they had the chance. Now is that chance for the Wan/Debolt children. Forcing the parties' Americanized children, who have only known freedom to be themselves and say what's on their mind, to return to a place where statements they have already made subject them – indefinitely - to legal jeopardy, and to have to endure a climate fear, oppression and forced silence—creates a high risk of serious and lasting psychological harm.

The parties' eldest child knows enough to not want to return to Hong Kong. His wishes should be respected. The younger child does not have the maturity to know better.

Michel respectfully asks that the Court protect the children and deny the petition to return them to Hong Kong.

## **PROCEDURAL HISTORY**

1.    On September 8, 2020, Wan filed her Complaint and Petition for the return of her and Michel's minor children pursuant to the Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and the International Child Abduction Remedies Act ("ICARA"). (Dkt. 1)

2.    Wan is a citizen of Hong Kong and the United Kingdom. Wan filed the action to secure the return of the two minor children, T.D. and A.D., from Illinois to Hong Kong. The children were born in Hong Kong and are citizens of Hong Kong and the United States and the United Kingdom.

3.    Wan alleges that on July 18, 2020, Michel traveled with the minor children from Hong Kong to Shelbyville,

Illinois to visit relatives. Wan agreed to the trip. Wan contends that Michel originally said the minor children would return on August 17, 2020. However, Michel thereafter told Wan that he and the children will not return to Hong Kong.

4.   On October 7, 2020, Michel moved to dismiss Wan's Petition, arguing that the Hague Convention is now void with Hong Kong insofar as recent events establish that Hong Kong is indistinguishable from the People's Republic of China (PRC), and the United States government declared Hong Kong is no longer autonomous from the PRC. (Dkt. 15). He further argued that because PRC is not a signatory to the Hague Convention, Hong Kong is no longer a party to the Convention, and, therefore, Wan failed to state a claim and her Petition should be dismissed with prejudice.

5.   Wan argued that Hong Kong is still a party to the Convention, and the Court does not have jurisdiction to

decide the sovereignty of Hong Kong as it is a nonjusticiable political question. (Dkt. 21).

6.    On October 15, 2020, this Court appointed Jared Scott as the children's guardian *ad litem*.

7.    On October 26, 2020, this Court denied Michel's Motion to Dismiss. (Dkt. 24).

8.    On November 2, 2020 Michel Answered Wan's Petition and asserted several affirmative defenses to the return of the children under the Hague Convention (Dkt. 27)

## **STIPULATION TO PETITIONER'S CASE IN CHIEF**

Without conceding any arguments he may have to the applicability, or lack thereof, of the Hague Convention to this matter, Michel stipulates and agrees that:

1. The minor children are both under the age of 16;

2. The minor children's habitual residence is Hong Kong for the purposes of the Hague Convention;

3. Wan has satisfied the elements set forth in subsections
   (a) and (b) of Article 3 of the Hague Convention; and

4. Wan filed her Petition within one year of the minor
   children's retention in Illinois.

## ARGUMENT

## I.  HAGUE CONVENTION GENERALLY.

The Hague Conference on Private International Law adopted the Hague Convention in 1980 "[t]o address the problem of international child abductions during domestic disputes." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4, 134 S.Ct. 1224, 188 L.Ed.2d 200 (2014) (internal quotation marks omitted).

The International Child Abduction Remedies Act, 102 Stat. 437, as amended, 22 U.S.C. § 9001 *et seq.*, implements our Nation's obligations under the Convention. It is the Convention's core premise that "the interests of children ... in matters relating to their custody" are best served when

custody decisions are made in the child's country of "habitual residence." Convention Preamble, Treaty Doc., at 7; see *Abbott v. Abbott,* 560 U.S. 1, 20, 130 S.Ct. 1983, 176 L.Ed.2d 789 (2010).

To that end, the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides. Art. 12, Treaty Doc., at 9 (cross-referencing Art. 3, *id.*, at 7). The removal or retention is wrongful if done in violation of the custody laws of the child's habitual residence. Art. 3, *ibid.* The Convention recognizes certain exceptions to the return obligation. Prime among them, a child's return is not in order if the return would place her at a "grave risk" of harm or otherwise in "an intolerable situation." Art. 13(*b*), *id.*, at 10. *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020).

## II.   HONG KONG, PRO-DEMOCRACY PROTESTS AND THE NATIONAL SECURITY LAW.

Much of the evidence this Court will hear with respect to (a) why the children have expressed their wish to not return to Hong Kong and (b) why repatriating them poses a grave risk to them will center around the rapidly diminishing freedoms permitted by the authoritarian government of the People's Republic of China, Wan's own teachings to the children to be suspicious of the Central People's Government of the People's Republic of China, and the children's internalization of those teachings.

After nearly two million citizens (of total population of seven million) marched on the streets of Hong Kong in 2019 to protest legislation that would have allowed the extradition of Hong Kong citizens to mainland China, such legislation was withdrawn. Unsatisfied with this limit on its ability to subject Hong Kong citizens to mainland China (i.e., one party) style justice, the Central People's Government

bypassed well established legislative procedures and imposed the draconian National Security Law ("NSL") on June 30, 2020, immediately subjecting the previously free people of Hong Kong to arbitrary arrests, trial without jury, and subjective detention for what are essentially thought crimes, all but driving a stake through the heart of the idea of "one country, two systems." The application of the NSL is so arbitrary and the consequences under it so severe, that nary a protestor has taken to the street to object, leaving a vibrant, liberal-minded citizenry mute to raise their objections.

Since the enactment of the NSL, things have only gotten worse. Hong Kong children are being force-fed communist propaganda in schools, citizens are being encouraged to report their friends, family members, and neighbors for harboring unfavorable political views, legislation has been introduced to limit the ability of Hong Kong citizens to freely

leave the city, and, just this week, Hong Kongers have been ensured that their next election will be anything but free and fair, as China has passed laws to ensure that only loyal patriots may seek and hold elected office there. It is hardly surprising that Hong Kongers are fleeing the city by the thousands and at an ever-increasing rate.[2]

Like rats boarding, rather than fleeing, a sinking ship, Wan seeks to bring the minor children to this modern-day Oceania. And it is with these Orwellian developments in mind that this case must be assessed. Accordingly, before turning to Michel's defenses, a discussion of Hong Kong under China's National security law follows.

### a. China's Passage of the NSL and its Universal Condemnation.

On June 30, 2020, China enacted the *Law of the People's Republic of China on Safeguarding National Security*

---

[2] Respondent Ex. 63.

*in the Hong Kong Special Administrative Region*, commonly known as the "National Security Law" or "NSL", alarming the people of Hong Kong and the free world, which universally condemned its enactment.

On June 26, 2020, the United Nations Office of the High Commissioner for Human Rights issued the following statement of concern over China's warning that a national security law was imminent:

> Most recently, the National People's Congress took a decision to draft a national security law for the Hong Kong SAR – without any meaningful consultation with the people of Hong Kong – which would, if adopted, violate China's international legal obligations and impose severe restrictions on civil and political rights in the autonomous region. The national security law would introduce poorly defined crimes that would easily be subject to abuse and repression, including at the hands of China's national security organs, which for the first time would be enabled to establish 'agencies' in Hong Kong 'when needed'.

> The draft law would deprive the people of Hong Kong, who constitute a minority with their own distinctive history, cultural and linguistic and even legal traditions, the autonomy and fundamental rights guaranteed them under the 1984 Sino-British Joint Declaration and the 'One Country, Two Systems' governance framework. It would undermine the right to a fair trial and presage a sharp rise in arbitrary detention and prosecution of peaceful human rights defenders at the behest of Chinese authorities. [3]

The UN Statement called on "the international community to act collectively and decisively to ensure China respects human rights and abides by its international obligations: Similar condemnation followed passage of the NSL.

On July 14, 2020, President Donald Trump issued Executive Order 13936, condemning China's action and

---

[3] https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=26006.

declaring, in part, as a matter of United States law, "that the Special Administrative Region of Hong Kong  is no longer sufficiently autonomous to justify differential treatment in relation to the People's Republic of China ...".[4]

On July 17, 2020, Amnesty International, the respected Human Rights Organization issued a statement entitled "**Hong Kong's national security law: 10 things you need to know,"** noting that:

> The Chinese authorities forced the law through without any accountability or transparency: it was passed just weeks after it was first announced, bypassing Hong Kong's local legislature, and the text was kept secret from the public and allegedly even the Hong Kong government until after it was enacted.[5]

---

[4] Respondent Ex. 74.
[5] Respondent Ex. 115.

The statement listed "10 reasons why everyone should be worried about this new law" and provides specific examples and reasons for these concerns:

1. Endangering national security" can mean virtually anything
2. The law has been abused from day one
3. The law tightens controls over education, journalists and social media
4. People could be taken to mainland China for unfair trials
5. The law applies to everyone on the planet
6. The investigating authorities have new and extensive powers
7. The Chinese government now has a national security arm in Hong Kong
8. The Hong Kong government also has a new body that is not subject to oversight
9. Human rights protections risk being overridden
10. The law has already had an immediate chilling effect[6]

On August 10, 2020, in a "Statement on Hong Kong" the Foreign Ministers of Australia, Canada, New Zealand,

_____

[6] *Id.*

and the United Kingdom, and the United States Secretary of State declared:

> We express deep concern at Beijing's imposition of the new National Security Law, which is eroding the Hong Kong people's fundamental rights and liberties.[7]

On September 1, 2020, a group of "Special Rapporteurs" for the United Nations Office of the High Commissioner for Human Rights sent a joint letter to China urged it to reconsider the law to ensure compliance with China's international human rights obligations with respect to the HKSAR. The Rapporteurs concluded that the NSL "lacks precision in key respects, infringes on certain fundamental rights" and noting that "ill-defined and/or overly broad laws... are open to arbitrary application and abuse and may lead to arbitrary deprivation of liberty."[8]

---

[7] Respondent Ex. 114
[8] Respondent Ex. 113

By forcing the NSL on Hong Kong with no input from Hong Kong, China—once and for all—cast aside the pretense that Hong Kong is in any way autonomous from China. If there ever was any doubt, China made it crystal clear that Hong Kong is, and always will be, part of China, and subject to its absolute control.

What has happened since the passage of the NSL has borne out the worst fears of many and reveals that much more is to come.

- Hong Kong authorities set up a hot line for citizens to secretly report violations of the NSL, reportedly receiving over 10,000 tips in the first week.

- Dozens of people in Hong Kong have been arrested and charged under the NSL, most for political activity or for their expressed beliefs, and a number have been denied bail.

- All civil servants in Hong Kong have been required to take loyalty oaths.

- Moving swiftly to stamp out all dissent and assure that Hong Kong is governed only by China loyalists, China's national legislature,

on March 11, 2021, passed a resolution revamping the structure of Hong Kong's Legislative Counsel and empowering a China controlled vetting committee to ensure that only "patriots" loyal to China will be allowed to run for election and govern Hong Kong.

- The U.S. State Department promptly issued a statement on March 11 condemning China's action as a "continuing assault on democratic institutions in Hong Kong."[9]

The continuing assault on democratic institutions described by the State Department is part of a broader and deeper assault on the fundamental rights and freedoms of individuals in Hong Kong,

This is not an abstract danger. The apparatus of the NSL is unapologetically authoritarian in many respects. As shown by the many arrests which have already occurred, China will show no mercy to those who defy it, whether inside Hong Kong or anywhere else in the world. And make no mistake,

---

[9] https://www.state.gov/assault-on-democracy-in-hong-kong/.

the NSL is China's law and it will be enforced as China wants to enforce it, when China wants to enforce it, and against whom China wants to enforce it.  And school-aged children are not exempt from its scope, as will be discussed below. But, first, we will summarize the most relevant provisions of the of China, by China, for China NSL.

**b. Specific Provisions of the NSL.**

      i. <u>China's Unilateral Authority to Implement the NSL and Investigate and Punish Violations.</u>

The NSL effectively creates a separate arm of the Hong Kong government—the Committee for Safeguarding National Security of the Hong Kong Special Administrative Region (the "NSL Committee")—unelected, unrestrained, and unaccountable to anyone outside of Beijing. The NSL Committee, a puppet arm of the mainland communist party, is empowered to oversee the implementation of the law, including investigations and punishment of violations of the law:

- Article 11 states that "[t]he Chief Executive of the Hong Kong Special Administrative Region **shall be accountable to the Central People's Government** for affairs relating to safeguarding national security in the Hong Kong Special Administrative Region."

- Article 12 provides that the NSL Committee "shall be under the supervision of and accountable to the Central People's Government."

- Article 15 provides for **the Central People's Government** to appoint a National Security Adviser to sit in on the NSL Committee meetings and to provide "advice." (Emphasis added.)

Despite lip service and empty platitudes in the NSL about respecting and protecting human rights and freedoms, including freedom of speech (Article 4), and adhering to the rule of law in "preventing, suppressing, and imposing punishment for offenses endangering national security (Article 5), and other statements about following the rule of law, the nature of the NSL bureaucracy, including the

pervasive control by Beijing, combined with the potentially unlimited scope of the NSL, allows for unbridled repression of human rights. In fact, the Hong Kong Court of Final Appeal (the highest court in Hong Kong) ruled on February 9, 2021 that it lacks jurisdiction to even consider whether the NSL is even compatible with Hong Kong's constitution (the "Basic Law"), or the Hong Kong Bill of Rights, which implements the International Covenant on Civil and Political Rights and has constitutional status.[10] Accordingly, since the NSL expressly prevails over any local Hong Kong law to the contrary, and since the NSL means whatever Beijing says it means, these platitudes will be of little consolation to anyone targeted by the authorities for actions deemed criminal by Beijing.

---

[10] *HSKAR and Lai Chee Ying*, ¶42, available at https://legalref.judiciary.hk/lrs/common/ju/ju_frame.jsp?DIS=133491.

ii. <u>The NSL Committee Operates in Secret—with no</u>
<u>Accountability, and with no Judicial Review.</u>

The NSL Committee that oversees enforcement and punishment of the law is accountable to no one besides the Central People's Government.  It is authorized to work in secret and its decisions are not subject to judicial review. It is above and immune from local law. As stated in Article 14:

> No institution, organisation or individual in the Region shall interfere with the work of the Committee. Information relating to the work of the Committee shall not be subject to disclosure. Decisions made by the Committee shall not be amenable to judicial review.

iii. <u>A Separate NSL Police Department Enforces the</u>
<u>NSL.</u>

The NSL requires the Hong Kong Police to establish a separate department for enforcing the NSL, and allows that department to "***recruit qualified professionals and technical personnel from outside the Hong Kong Special Administrative Region to provide assistance in the***

***performance of duties for safeguarding national security***." (Article 16) (Emphasis added). This can only mean personnel from the Communist controlled mainland.

Article 17 vests this special police unit with broad powers to collect intelligence, plan operations, investigate offenses, and with the open-ended mandate to "preform other duties and functions necessary for enforcement of this Law."

    iv. <u>A Special NSL Prosecution Division Sworn to Secrecy.</u>

Article 18 requires Hong Kong to establish a "specialised prosecution division responsible for the prosecution of offences endangering national security and other related legal work" with specially appointed prosecutors appointed with the consent of the NSL Committee. The head of this division must swear to secrecy.

v. <u>Special Funding and Creation of Undefined New "Posts" Unrestricted by Law.</u>

Article 19 provides for revenue appropriations to safeguard national security and to "approve the establishment of relevant posts, which are not subject to any restrictions in the relevant provisions of the laws in force in the Region." (Emphasis added.)

vi. <u>The NSL Provides for Mainland-Approved Selection Of Judges and Undercuts the Independence of the Judges Assigned to Hear NSL Prosecutions.</u>

The judges who will hear NSL cases are chosen from the pool of sitting from Hong Kong judges by Hong Kong's Chief Executive—who is accountable to Beijing.  Judges who are deemed to have made "any statement any statement or behaved in any manner endangering national security"— whatever this is deemed to mean-- are not eligible to serve and must be removed from the assignment. (Article 44)

vii. <u>Discretion to Deny Trial by Jury and to Conduct Trials on the Mainland.</u>

In cases concerning offenses endangering national security, the right to trial by jury may be suspended ***by the Secretary of Justice***. [11] (Article 46) There is no provision for judicial review of this decision. Further, a case can be sent to mainland China for trial in certain vaguely described circumstances. (Article 55) There is no provision for judicial review of this decision.

  viii. <u>The NSL Prevails All Other Laws and Means What Beijing Says it Means.</u>

The NSL supersedes local Hong Kong law: "This Law shall prevail where provisions of the local laws of the Hong Kong Special Administrative Region are inconsistent with this Law. (Article 62). The power to interpret the NSL is "vested

---

[11] The same secretary of justice currently subject to U.S. Treasury Department sanctions for "undermining Hong Kong's autonomy." See https://hk.usconsulate.gov/n-2020080702/.

in the Standing Committee of the National People's Congress." (Article 65).

   ix. <u>The Offenses: "Secession", "Subversion", "Terrorist Activities", and "Collusion with a Foreign Country or with External Elements to Endanger National Security."</u>

As noted by Amnesty International, the United Nations Office of the High Commissioner for Human Rights, "Special Rapporteurs" for the United Nations Office of the High Commissioner for Human Rights, and numerous other commentators, the NSL defines crimes so vaguely as to be subject to arbitrary application and abuse and arbitrary deprivation of liberty.

For example, Article 22 ("subversion") makes it a crime for a person to commit or participate in "any of the following acts by …other unlawful means with a view to subverting the State power…", including (1) … undermining the basic system of the People's Republic of China established by the Constitution of the People's Republic of China."

The NSL does not define other unlawful means, but
the Hong Kong Crimes Ordinance (sections 10(1) and 9(1))
criminalizes "sedition" (punishable by fine and
imprisonment), which is broadly defined to include uttering
or publishing words intended to:

> (a) to bring into hatred or contempt or to excite disaffection against the person of [the government of Hong Kong]; or...
> (c) to bring into hatred or contempt or to excite disaffection against the administration of justice in Hong Kong; or
> (d) to raise discontent or disaffection amongst ... inhabitants of Hong Kong; or
> (e) to promote feelings of ill-will and enmity between different classes of the population of Hong Kong..."

The NSL may be broad enough—if Beijing says it is—to
include mere utterances of contempt for the Hong Kong
government or the Chinese Communist Party on the logic
that such utterances may tend to subvert and undermine
the State power and undermine the basic system of the
People's Republic of China.

The language of the Hong Kong sedition ordinance is eerily similar to language in Article 29 of the NSL, which criminalizes "Collusion with a Foreign Country or External Elements to Endanger National Security". This offense is defined to include

> conspir[ing] with a foreign country or an institution, organisation or individual outside the mainland, Hong Kong and Macao of the People's Republic of China, or directly or indirectly receiv[ing] instructions, control, funding or other kinds of support from a foreign country or an institution, organisation or individual outside the mainland, Hong Kong and Macao of the People's Republic of China, to commit any of the following acts...
> (5) provoking by unlawful means hatred among Hong Kong residents towards the Central People's Government or the Government of the Region, which is likely to cause serious consequences.

Punishment for such thought crimes ranges from 3 years to over 10 years imprisonment.

What it means to receive support, directly or indirectly, from any person or organization outside of Hong Kong or the

mainland is far from clear, and intentionally so. Is it limited to belonging to or receiving materials from organizations such as Amnesty International, which criticize the Hong Kong or Chinese governments? Does simply having a father who lives outside of Hong Kong, but supports children, who share his critical thoughts about the Hong Kong or Chinese governments suffice? Or does a mother in Hong Kong sharing views critical of Communist China with her children while in the United States, and those children sharing similarly critical views back, qualify?

Lest anyone think that no one could be punished in Hong Kong for mere disrespect to the government, consider the National Anthem Ordinance enacted in Hong Kong on June 12, 2020, shortly before the enactment of the NSL. Among other things, this law:

- requires all individuals to "respect the national anthem, preserve the dignity of the national anthem, and… sing the national anthem on appropriate occasions;"

- dictates the "etiquette" to be followed by the persons singing the National Anthem — "(a) to stand solemnly and deport themselves with dignity; and (b) to not behave in a way disrespectful to the national anthem;"

- dictates how the National Anthem is to be played and sung;

- ***and criminalizes conduct which "insults" the National Anthem by singing it "in a distorted or disrespectful way" or "publicly and intentionally insults the national anthem in any way," punishable by a fine and imprisonment for up to five years.*** (Emphasis added.)

A person doesn't have to kneel during the anthem to go to jail. Failing to stand solemnly and with dignity will suffice.

    x.  <u>Unlimited Geographical Scope of the NSL.</u>

The NSL applies to acts committed within or outside of Hong Kong—anywhere in the world. (Article 36).

    xi.  <u>Arrest and Detention/Presumption Against Bail.</u>

There is a presumption against bail if a person is arrested and detained under the NSL. (Article 42).

xii.  <u>No Right Against Self Incrimination.</u>

The NSL police, "in investigating serious crimes"  may prohibit a mere suspect from leaving Hong Kong, intercept communications and conduct covert  surveillance (solely on the approval of the Chief Executive), and "require[e] a person, who is suspected, on reasonable grounds, of having in possession information or material relevant to investigation, to answer questions and furnish such information or produce such material."

xiii.  <u>No Statute of Limitations.</u>

Absent from the NSL is any time limit on prosecution, allowing authorities to bring charges at any time in the future.

xiv.  <u>No Minimum Age for Prosecution.</u>

The NSL omits any reference to minimum age of persons to whom its sanctions apply. Coupled with the lack of a statute of limitations, it is not inconceivable that a person

could be charged in the future for statements or acts that were made when that person was a child.

### c. Far from being Exempt from the NSL, School Children are its Target.

Articles 9 and 10 of the NSL specifically mention schools as part of its scope. Article 9 states, in part:

> The Government of the Hong Kong Special Administrative Region shall take necessary measures to strengthen public communication, guidance, supervision and regulation over matters concerning national security, including those relating to schools, universities, social organisations, the media, and the internet.

Article 10 further provides

> The Hong Kong Special Administrative Region shall promote national security education in schools and universities and through social organisations, the media, the internet and other means to raise the awareness of Hong Kong residents of national security and of the obligation to abide by the law.

On February 4, 2021, pursuant to the NSL, the Hong Kong Government Education Bureau issued a set of detailed directives to schools and teachers dictating how they are to comply with the NSL, including the discipline of students for violations of the NSL.

These directives were nothing short of alarming. As reported in the South China Morning Post on February 10, 2021:

**Hong Kong schools given sweeping guidelines on bringing national security law into the classroom**

Government releases seven documents covering how nearly all of campus life should conform to controversial law, with education to begin as young as age six
While some teachers welcome the clear instructions, others warn government is creating a climate of fear among students who will worry about crossing the line

12

One such directive provide as follows:

> "Safeguarding national security is the constitutional responsibility of the Hong Kong Special Administrative Region (HKSAR) and also the common obligation of all Hong Kong residents."
> \*\*\*

---

12 Respondent Ex. 66

"It is the responsibility of schools to implement national security education through the school curriculum."[13]

Another, bearing the disturbingly benign title "*Maintaining a Safe Learning Environment-Nurturing Good Citizens*," emphasizes that the NSL applies to everybody, including children, and that schools have a "significant role to play" in enforcing the NSL, not just teaching it:

"The National Security Law concerns every member of the community." (p. 1)

\*\*\*

The National Security Law is enacted for the purpose of preventing, suppressing ***and imposing punishment*** for acts and activities that endanger national security. In particular, preventive efforts should be accorded priority in order to minimise the need for suppression and punishment. As far as prevention and education are concerned, all schools (***including primary schools***, secondary schools and

---

[13] Respondent Ex. 100 (Education Bureau Circular No. 2/2021: National Security Education in School Curriculum - Implementation Mode and Learning and Teaching Resources).

kindergartens) have a significant role to
play. (p. 4) (Emphasis added.)[14]

Further, to those wishful thinkers who would say that the

NSL is "only" targeted at political activists and protestors

who recklessly advocate their beliefs in public, Circular No.

3/2021 is a stark warning that this is not the case and that

political targets are just the beginning.

> "As time progresses, the concept of
> national security ***is not only confined to
> political security, territorial security
> and military security***, but may also
> encompass economic security, ***cultural***
> security, social security, technological
> security, cyber security and ecological
> security, etc., all of which are integral to
> the national security framework.
> (Emphasis added)[15]

The government could not be clearer. Everything is targeted

by the NSL.  No one (and  no aspect of life) is free of the

---

[14] Respondent Ex. 101 (Education Bureau Circular No. 3/2021:
National Security:  Maintaining a Safe Learning Environment-
Nurturing Good Citizens).
[15] Respondent Ex. 101.

government's watchful eyes and iron fist for those who step out of line.  This is not our "interpretation" of the NSL's scope or mere speculation. The government is not being coy about its plans for the NSL. **It is saying loudly and clearly—to all those who will listen, including the Debolt family—that the worst is yet to come.**

In addition to the generalities of the above circulars, Hong Kong has also issued *National Security: Specific Measures for Schools* (the "Specific Measures"). While the Specific Measures say that the first objective is to teach the law and encourage understanding and compliance through education, they also make it clear that strict compliance is nonnegotiable. The NSL requires compliance and is not subject to debate or disagreement:

> National security is of great importance. Teachers should not treat it as if it is a controversial issue for discussion as usual… ***[A]s far as national security is***

***concerned, there is no room for debate
or compromise.*** (Emphasis added.)[16]

Violations by students deemed "serious" are to be
reported to the authorities, as explained below in
Appendices 5 of the Specific Measures:

| Area of work | Key points |
|---|---|
| Student guidance, discipline and support | • In accordance with the school-based guidance and discipline policy, schools should explain clearly to students their requirements for students' behaviour so as to help students develop a sense of responsibility, commitment and law-abidingness.<br><br>• In case individual students are found to have breached the rules, schools should adopt an appropriate guidance and discipline approach to help them improve.  If the case is serious and the student concerned refuses to heed advice after repeated persuasion, the school should impose appropriate punishment and make referral to professionals for follow-up actions when necessary. |

17

Appendix 6 goes on to provide specific instructions for
educators to report their students to the authorities:

"Examples of Incidents Involving Political
Propaganda in Schools and
Suggested Ways of Handling

---

[16] Respondent Ex. 108, page 8.
[17] *Id.*, appx. 5, page 5.

\*\*\*

Note: Please make a record of the suspected illegal acts, the people involved and details of the situation. *When needed, the school should report and provide the relevant information to the Police for follow-up.*" (Emphasis added.)[18]

Finally, if history is any indication, things will get much worse in Hong Kong as China further tightens its grip on the nation and stifles dissent.

On March 13, 2020, the  U.S. Department of State issued its "*2019 Country Reports on Human Rights Practices: China (Includes Hong Kong, Macau, and Tibet),*" describing China as "an authoritarian state in which the Chinese Communist Party (CCP) is the paramount authority."[19] The Report goes on to discuss the abhorrent human rights abuses

---

[18] *Id.*, appx 6, page 3.
[19] https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/china/

by the PRC in other so-called "autonomous" regions of China

. For example:

> During the year the government significantly intensified its campaign of mass detention of members of Muslim minority groups in the Xinjiang Uighur Autonomous Region (Xinjiang). Authorities were reported to have arbitrarily detained 800,000 to possibly more than two million Uighurs, ethnic Kazakhs, and other Muslims in internment camps designed to erase religious and ethnic identities. Government officials claimed the camps were needed to combat terrorism, separatism, and extremism. International media, human rights organizations, and former detainees reported security officials in the camps abused, tortured, and killed some detainees.
>
> Human rights issues included arbitrary or unlawful killings by the government; forced disappearances by the government; torture by the government; arbitrary detention by the government; harsh and life-threatening prison and detention conditions; political prisoners; arbitrary interference with privacy; physical attacks on and criminal prosecution of journalists, lawyers, writers, bloggers, dissidents, petitioners,

and others as well as their family
members; censorship and site blocking;
interference with the rights of peaceful
assembly and freedom of association,
including overly restrictive laws that
apply to foreign and domestic
nongovernmental organizations (NGOs);
severe restrictions of religious freedom;
significant restrictions on freedom of
movement (for travel within the country
and overseas); refoulement of asylum
seekers to North Korea, where they have
a well-founded fear of persecution; the
inability of citizens to choose their
government; corruption; a coercive birth-
limitation policy that in some cases
included sterilization or abortions;
trafficking in persons; and severe
restrictions on labor rights, including a
ban on workers organizing or joining
unions of their own choosing. Official
repression of the freedoms of speech,
religion, movement, association, and
assembly of Tibetans in the Tibet
Autonomous Region (TAR) and other
Tibetan areas and of Uighurs and other
ethnic and religious minorities in Xinjiang
worsened and was more severe than in
other areas of the country.[20]

---

[20] *Id.*

In addition to these examples, the Report discusses a litany of major human rights abuses by the PRC, throughout its other "autonomous" regions, including "arbitrary deprivation of life and other unlawful or politically motivated killings," torture and other cruel, inhuman or degrading treatment or punishment," and "arbitrary arrest or detention" which "remained serious problems."

While Hong Kong is not yet experiencing these abuses to the extent of the other autonomous regions, the PRC's actions in these regions shows the lengths it will go to assert its will in the areas it controls. China considers Hong Kong to be an inalienable part of China, and returning the children to Hong Kong is effectively returning them to China.

The purpose of this discussion is not simply to elicit this Court's condemnation of the NSL or the Chinese government's anti-democratic crackdowns. Far from it. Rather, it provides the necessary backdrop for why, as a

result of their anti-communist views and western ideals, the Debolt children, in particular, will be subjected to clear, present, and grave danger if ordered returned to Hong Kong.

III. **MICHEL'S FIRST AFFIRMATIVE DEFENSE – ORDERING THE CHILDREN RETURNED TO HONG KONG POSES A GRAVE RISK OF EXPOSING THEM TO PHYSICAL OR PSYCHOLOGICAL HARM OR OTHERWISE PLACING THEM IN AN INTOLERABLE SITUATION.**

In his Answer to Wan's Petition, filed on November 2, 2020 Michel argued that ordering the children returned to Hong Kong would pose a grave danger to them and otherwise place them in an intolerable situation, citing both (a) the rapidly deteriorating political climate in Hong Kong which has particular impact on this children in this case,  and (b) Wan's frequent excessive disciplining of the children.  The evidence will support this assertion.

## a. Legal Standards.

Article 13(b) of the Convention provides that this Court is not bound to order the return of a child if the opposing party established, by clear and convincing evidence, that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." 22 U.S.C. § 9003(e)(2)(A); *Norinder v. Fuentes*, 657 F.3d 526, 534 (7th Cir. 2011). Analyzing this provision, the 8th Circuit held that:

> T]he word "grave" modifies "risk" and not "harm," this must be read in conjunction with the clause "*or otherwise* place the child in an intolerable situation." The use of the word "otherwise" points inescapably to the conclusion that the physical or psychological harm contemplated by the first clause of art. 13(b) is harm to a degree that also amounts to an intolerable situation.
> *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995) (citing *Thomson v. Thomson*, [1994] 3 S.C.R. 551, 119 D.L.R. 4th 253 (Can. S.C.C.)).

Determining whether a child faces a grave risk of harm is not an easy task. "Among the federal courts' most difficult and heart-rending tasks is the decision under the Hague Convention on the Civil Aspects of International Child Abduction whether to return an abducted child to the child's home country when a parent claims the child will face a grave risk of physical or psychological harm if returned." *Danaipour v. McLarey,* 286 F.3d 1, 4 (1st Cir. 2002). This is a "fact intensive-inquiry[.]" *Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007). The question is not whether the child has been harmed in the past, but if repatriating the child will expose him or her to a grave risk of harm if repatriated. See *Baran v. Beaty*, 526 F.3d 1340, 1346 (11th Cir. 2008) (finding that the Father's violent temper and abuse of alcohol would expose the child "to a grave risk of harm were he to be returned to Australia). There is no requirement that this Court find "that the risk be

'immediate'; only that it be grave." *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000). Further, a Court can—and should—consider whether the children object to return and whether they are "settled in their new environment as one factor in its grave risk analysis." *Blondin v. Dubois*, 238 F.3d 153, 165-66 (2d Cir. 2001) (concluding the District Court did not clearly err in finding an eight-year-old child was old and mature enough for her views to be considered in the context of a "grave risk" analysis under Article 13(b).

While the Courts have repeatedly held that the defenses available under the Hague Convention should be narrowly construed, "there is a danger of making the threshold so insurmountable that district courts will be unable to exercise any discretion in all but the egregious cases of abuse." *Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007).

Here, the evidence will show at least two bases for this Court to conclude that returning the children to Hong Kong poses a grave risk.

**b. The Rapidly Worsening Civil and Political Situation in Hong Kong Presents a Grave Risk of Harm Specifically to the Debolt Children.**

Article 13(b) of the Convention further permits a Court to refuse the return of children to a "zone of war, famine, or disease" as well as "when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Friedrich v. Friedrich* (*Friedrich II*), 78 F.3d 1060, 1069 (6th Cir. 1996). "A court must satisfy itself that the child will not only in theory be protected, but will in fact be protected if returned. That is to say, a court may not rely upon a foreign legal system to theoretically protect children…" *Vale v. Avila*, 06-1246, 2008 WL 11363822, at *7 (C.D. Ill. May 6, 2008) (citing *Van De Sande v. Van De Sande*, 431 F.3d 567, 570–

71 (7th Cir. 2005)). Further, "[t]hat a child's proximity to actual or threatened violence may pose a grave risk to the child." *Gomez v. Fuenmayor*, 812 F.3d 1005, 1014 (11th Cir. 2016).

As set forth above, while not constituting a physical warzone, there can be no credible argument that Hong Kong, under the NSL, is unwilling and unable of providing the Debolt children with adequate protection, thereby subjecting them to a grave risk of harm upon return. Furthermore, the culture of silence that has forced two million protestors off the streets of Hong Kong, represents a psychological war unleashed by China's leaders in Beijing against the previously liberal minded, freedom loving citizens of Hong Kong, and particular those children (such as the Debolt children) who have been taught by their parents to identify, understand and question the acts of China's authoritarian government. This Court will hear, from the parties, the

experts, and from the children themselves, about the children's outspoken and articulate anti-communist and pro-democracy beliefs, beliefs which now constitute criminal acts, even when espoused in the United States (which the children have done repeatedly since July 2020). What this Court will not hear is any evidence that confinement in the allegedly peaceful enclave of Discovery Bay will somehow insulate the Debolt children from China's full-scale assault on the freedoms which they previously enjoyed in Hong Kong and which they currently enjoy in the United States. If returned to Hong Kong, they will have to live under the culture of fear instilled by the NSL and be perpetually wary of running afoul (or that some act even in the distant past is now interpreted as running afoul) of the grave risks presented by the NSL's nefarious scheme and nebulous provisions.

The Debolt children have been raised in a household which endorses pro-democracy and anti-communist viewpoints and in which the children have spoken (and continue to speak) openly and freely about those views. Dr. Jaffe will testify that both children are aware of Hong Kong's current political climate, harbor negative views about the Chinese government and its leadership, and have been instructed to keep their beliefs to themselves at all costs, as a single slip of the tongue or click of the mouse could subject them to criminal penalties. The children have been taught that in Hong Kong, they cannot "talk about the communists outside the house [or] with anybody else," and are aware of protestors being incarcerated, shot, and killed for "trying to get [their] freedom of speech." They are painfully aware that children their age have been arrested for expressing a dislike of communism.

The children inherited these views from their mother who, before deciding that burying her head in the sand and claiming that everything is fine in Hong Kong was expedient for purposes of this litigation, harbored vocal anti-Communist views, lamented China's heavy-handed crackdown on individual and political freedoms, took part in the anti-communist protests in the summer of 2019 which were the catalyst for the NSL, and even sought to provide aid to protestors as they attempted to evade arrest by the Hong Kong police.

Dr. Jaffe will explain that Wan's about-face on Hong Kong serves only to further endanger her children. He will further opine that this Chinese-imposed "culture of silence" will strip them of their sense of agency, prevent them from feeling safe and connected to their environment, and intensify the trauma of witnessing violence by being forced to internalize their experiences.

The fact that the children will be forced to internalize their thoughts and stifle their speech in school, lest they find themselves on the receiving end of a police report lodged by their teachers, while being brainwashed with pro-communist propaganda which they have been conditioned to reject only heightens the grave risks return poses to these children. The risk to the children is unabated and growing, primarily because Wan continues to inculcate them with her anti-China views (which the children then internalize).

The children should not be subjected to the psychological trauma of being forced to live and attend school under the microscope of an unfamiliar authoritarian regime, while continually being exposed at home to now criminalized points of view.

Dr. Jaffe will further opine—and the evidence will show—that both children have been raised in a climate where they are free to voice their opinions about politics,

their community, and anything they may disagree with. Having spent substantial time in the United States, throughout their childhoods, the children understand and appreciate the value of free speech. The consequences of ripping these children away from their Illinois home, where they have been well-settled (*Blondin*, 238 F.3d 165-66) and where they enjoy unrestricted freedoms of speech, assembly, association, and thought, and dropping them into a now-unfamiliar Orwellian state are hardly abstract or trifling. Two children raised to freely speak their mind throughout their entire lives, will be suddenly forced to stifle their words and their thoughts at school, in public, online, and in virtually every human interaction, save those with each other and their parents. This is the burden Wan wishes her children to bear, while continuing to feed them points of view now deemed subversive in Hong Kong.

Finally, this Court should be wary of any argument that Wan and the children will simply leave if the situation gets bad enough. As noted by our State Department, "The PRC government arbitrarily enforces local laws *** through the use of exit bans on U.S. citizens and citizens of other countries without due process of law. *** [T]here is no reliable mechanism or legal process to find out how long the ban might continue or to contest it in a court of law."[21] In January 2021, the Hong Kong government reportedly proposed legislation that would allow it to bar anyone (Hong Kong resident or not) from leaving Hong Kong on any grounds.[22]

---

[21] https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/hong-kong-travel-advisory.html
[22] https://hongkongfp.com/2021/02/13/intrusive-power-concern-over-proposed-hong-kong-law-that-could-bar-anyone-from-leaving-city/

### c. Wan's Physical and Emotional Abuse of the Children Presents a Grave Risk of Harm.

Since the adoption of the Hague Convention, there has been a shift toward recognizing domestic violence as posing a grave risk toward the child. This shift commenced in 1990 when a congressional resolution passed which specifically found that "children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser" and "the effects of physical abuse of a spouse on children include * * * the potential for future harm where contact with the batterer continues [because] * * * children often become targets of physical abuse themselves or are injured when they attempt to intervene on behalf of a parent." H.R. Con. Res. 172, 101st Cong., 104 Stat. 5182, 5182 (1990); see also *Gomez v. Fuenmayor*, 812 F.3d 1005, 1014 (11th Cir. 2016) (it "requires no stretch of the imagination to conclude that serious, violent domestic abuse repeatedly directed at a parent can easily be turned

against a child"). The courts commenced recognizing these concepts around 2000 and stated so in *Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000). In that case, the First Circuit gave express recognition to the fact that the exposure of a child to domestic violence is a sufficient risk to preclude the child's return under the Convention. *Id.* Recently, the grave risk defense was also recognized by the United States Supreme Court as "a mechanism for guarding children from the harms of domestic violence." *Monasky*, 140 S. Ct. at 729.

The Seventh Circuit has made clear that "[i]f handing over custody of a child to an abusive parent creates a grave risk of harm to the child, in the sense that the parent may with some nonnegligible probability injure the child, the child should not be handed over[.]" *Van De Sande v. Van De Sande*, 431 F.3d 567, 571 (7th Cir. 2005).

Wan's documented history of psychological manipulation and physical abuse of the children poses a

grave risk of harm to the children if ordered returned. This Court will hear substantial evidence regarding Wan's regular use of alcohol, often in front of the children. This Court will hear of a particularly egregious incident wherein Wan forced TD to consume a stale banana, off of the floor, and in front of his friends. This Court will similarly hear, both through testimony and through audio recordings, myriad instances of Wan's excessive physical punishment of the children and emotional tormenting of the children, often bringing them to tears. This is the precise type of abuse which courts have found sufficient to prevent the return of children. *Baran v. Beaty*, 526 F.3d 1340.

## IV. THE CHILDREN'S WISHES TO REMAIN IN THE UNITED STATES SHOULD BE RESPECTED.

Michel's second Affirmative Defense is that the children have objected to their return to Hong Kong. As set forth below, T.D.'s wishes in particular provide a separate, independent basis to deny Wan's Petition.

## a. Legal Standards

Article 13 of the Convention allows courts to refuse an order of return where a child objects to their return and that child has attained an age and degree of maturity at which it is appropriate to take account of such views. See Convention, Art. 13. The parties' two minor children, T.D., age ten, and A.D., age eight—nearly nine, have objected to being returned to Hong Kong and there is support for this Court to make a determination T.D. has attained an age and degree of maturity at which it is appropriate to take into account his views.

Article 13 of the Convention, referred to as the "mature child exception," provides judicial authority for the refusal of repatriation where the child objects to a return to their habitual residence. Article 13 of the Convention states in relevant part as follows:

> "Notwithstanding the provisions of the preceding Article, the judicial or

administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that – ****

The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence."

Convention, art. 13.

To carry the burden on this defense, the respondent "must establish by a preponderance of the evidence (1) that the child has 'attained an age and degree of maturity at which it is appropriate to take account of its views' and (2) 'that the child objects to being returned.' Hague Convention,

Art. 13; see 22 U.S.C. § 9003(e)(2)(B) (burden of proof) (Citation.)." *Custodio v. Samillan*, 842 F. 3d 1084, 1089 (8th Cir. 2016).

This exception recognizes "children are not inanimate objects—they are people with agency of their own." *Rodriguez v. Yanez*, 817 F. 3d 466, 475 (5th Cir. 2016). While narrowly construed, a child's objection can be the sole reason a court refuses to order return. *Id.*; see also *de Silva v. Pitts*, 481 F. 3d 1279, 1286 (10th Cir. 2007). Courts may even consider a younger child's objection to an order of return as part of a broader analysis under Article 13(b)'s "grave risk" defense. See *Blondin v. Dubois*, 238 F. 3d 153, 166 (2d Cir. 2001) (concluding the District Court did not clearly err in finding an eight-year-old child was old and mature enough for her views to be considered in the context of a "grave risk" analysis under Article 13(b)). Where the child's objection is the sole basis for declining to order a

return, courts must apply a stricter standard in considering the child's wishes. *Custodio*, 842 F. 3d at 1088. A court's finding as to a child's objections is a " 'fact-intensive' determination that is based in part on the court's personal observations of the child." *Id.* at 1089.

       i.  <u>Age and Degree of Maturity</u>

As to the question of whether the child has attained an age and degree of maturity at which it is appropriate to take account of its views[,]' no minimum age has been established under the Convention as being sufficient to trigger consideration of the child's objections under this exception. *Blondin*, 238 F. 3d at 166. Instead, this determination is to be made on a case-by-case basis and is left to the court's discretion. *Avendano v. Balza*, 985 F. 3d 8, 13 (1st Cir. 2021).

As was recognized by the Tenth Circuit, "[g]iven the fact-intensive and idiosyncratic nature of the inquiry, decisions

applying the age and maturity exception are understandably disparate." *de Silva*, 481 F. 3d at 1287.

The *de Silva* court compared various cases involving the mature child exception. *Id.* Included among the cases highlighted by the *de Silva* Court was the Southern District of Ohio's decision in *Anderson v. Acree*, 250 F. Supp. 2d 876, 883 (S.D. Ohio 2002), finding an eight-year-old child sufficiently mature to consider objections where the child "was composed, calmly and readily answered questions, pointed to [her habitual residence] on a globe, and indicated her understanding of the difference between truth and falsehood and of her obligation to tell the truth." *de Silva*, 481 F. 3d at 1287. The Circuit Court also noted the Fifth Circuit's decision in *England v. England*, 234 F. 3d 268, 272 (5th Cir. 2000), reversing the district court's consideration of the child's objections where the thirteen-year-old child "had learning disabilities, had had four mothers in twelve

years, had attention deficit disorder, took Ritalin, and was sacred and confused." *de Silva*, 481 F. 3d at 1287.

Courts have further considered a child sufficiently mature under this exception where the child was found to have " 'exhibited strong cognitive and social abilities, and clearly express a desire to remain with [the respondent] in the United States.' " *Rodriguez*, 817 F. 3d at 478. Sufficient maturity has also been found where a parent testified her sons, ages 13 and 11, were "capable of forming their own opinions and attitudes about what they want to do and with whom" and, during the court's *in camera* interview, the boys were observed to be "polite and articulate[,]" "knew what it meant to tell the truth and appeared to understand the importance of doing so[,]" "where attentive and focused throughout the interview[,]" and "understood the nature and purpose of the court proceeding, recognizing that a determination about whether they would remain in the

United Stated or return to their [habitual residence] was in the offing, and took it very seriously." *Bandžius v. Šulcaite,* 18-CV-3811, 2018 WL 5018459, at *9 (N.D. Ill. Oct. 15, 2018). In *Avendano v. Balza,* the First District concluded the child—11 years old at the time of trial—was sufficiently mature to preclude an order of return where the child expressed desire to remain in the United States was " 'very clear, consistent and rational" based, in part, on the court's *in camera* interview with the child. *Avendano,* 985 F. 3d at 13-14.

### ii.  The Child's Objection to Being Returned

An objection to an order of return is properly stated where the child expresses more than just a preference between the two countries. *Rodriguez,* 817 F. 3d at 477. "[A] child must voice 'particularized objections to being returned' " which objections must be free of undue influence. *Bandžius,* 2018 WL 5018459, at *8. Custody-based

considerations such as an objection based on a wish to live with a particular parent are appropriately considered. *Rodriguez*, 817 F. 3d at 475; see also *Custodio*, 842 F. 3d at 1091 (agreeing with the Fifth Circuit's interpretation of the mature child exception as allowing for custody-based objections).

In *de Silva*, the Tenth Circuit affirmed application of the mature child exception where the magistrate judge interviewed the 13-year-old child *in camera* and "concluded:

> This Court has also considered the [sic] Jonathan's expressed opinions as to his status in accordance with Article 13(b) of the Hague Convention. 42 U.S.C. § 11603(e)(2)(A). This Court observed Jonathan to be a bright, expressive child with a well-developed understanding of his situation and the positions of his parents. He has attained an age and degree of maturity to so consider his views. Unlike Petitioner [Ms. de Silva], this Court did not find Jonathan to be particularly swayed by lavish gifts and wealth in forming an opinion that the schools were better in Oklahoma, he enjoyed his friends and activities and his

home. He is well-settled in his
environment in Oklahoma and expressed
his desire to remain in Oklahoma with
Pitts without apparent adult
indoctrination. Allowing him to remain
with Pitts while an Oklahoma court
determines custodial issues between his
parents is in his best interests at this
time.

*de Silva*, 481 F. 3d at 1286-1287.

In *Bandžius*, the Northern District Court of Illinois applied the mature child exception as an additional ground for denial of the father's petition for repatriation. *Bandžius*, 2018 WL 5018459, at *8. There the objections of the 13 and 11-year-old children were described as unequivocal and included concerns about leaving friends, school, and extended family in the United States as well as other opportunities available here. *Id.* at *9. The District Court also focused on the boys' "recognition that their lives would be upended by an order returning them to Lithuania." *Id.* The District Court noted the children's concern that a return to their habitual residence would "destroy the fabric of their

present family life" because they might be required to live with their father rather than their mother, the fact that the older child expressed to his mother he " 'might hurt himself' " if he had to go back to Lithuania, and the younger child's recognition that such a return would disrupt ties to his family including a new baby brother. *Id.* Further the District Court found no undue influence where the mother instructed the children to be confident and tell the truth. *Id.*

In *Avendano*, the First Circuit affirmed the District Court's refusal to order a return based on the mature child exception. *Avendano*, 985 F. 3d at 10. After hearing evidence from both parents, the GAL, three experts, and an in-person interview with the 11-year-old child, the District Court found the child was of sufficient age and maturity to have his wishes taken into consideration, that the child objected to being returned to Venezuela due to political and societal unrest; and the child's desire to remain in the United States

was reached independently. *Id.* at 12-13. As found by the District Court, the child's desire to remain in the United States was undisputed and that the child had not waivered in this decision which was described as being " 'very clear, consistent, and rational.' " *Id.* at 14-15.

In affirming the District Court's application of the mature child exception, the Circuit Court

> "noted 'that current living conditions in Venezuela were relevant to [the child's] desire to remain in the United States even though the district court ultimately did not find it necessary to decide [respondent's] claim that [the child] would face grave conditions if returned to Venezuela." *Id.* at 15.

The Circuit Court further explained,

> "the district court did not rely solely upon [the child's] expressed desire to remain in the United States and objection to being returned to Venezuela. The district court's ruling was also supported by socio-political conditions in Venezuela and [the child's] continued access to and communication with [the petitioning

parent] in deciding to retain [the child] in the United States." *Id.* at 16.

### b. T.D. is sufficiently Mature for this Court to Respect His Wishes and Deny Return.

The mature child exception contained in Section 13 of the Convention should be applied in this matter to deny an order of repatriation to Hong Kong.

The parties have two children. T.D., born in 2010, is ten years old and presently in the fifth grade at Stewardson-Strasburg Elementary School. A.D., born in 2012, is eight years old, nearly nine, and presently in the third grade at the same school as her brother.

Michel has asked this Court to conduct an *in-camera* interview of T.D. to observe his level of maturity and uninfluenced objections to repatriation. Michel respectfully requests the Court meet with T.D., without the parties or their attorneys present, so the Court can hear T.D.'s objections to returning to Hong Kong and his thoughtful

bases for these strongly held desires. Given the importance of this decision and the fact sensitive nature of the determination to be made under the mature child exception, the Court should have the opportunity to assess for itself T.D.'s level of maturity and uninfluenced positions against returning to Hong Kong.

The Court will hear from the Guardian Ad Litem concerning the children's previously stated objections to repatriation. The Guardian has opined that T.D. has expressed an unwavering opinion that he does not want to return to Hong Kong. The Guardian did not believe these opinions to be influenced by either party—concluding instead—they seemed to be the honest expression of the children's feelings. The children are well-traveled having been to several countries in Asia and Europe as well as various states within the United States. Both parents have exposed the children to information surrounding the social

and political situation in Hong Kong and the children have expressed consistent concerns about China exerting control in Hong Kong.

According to the Guardian, T.D. is very intelligent and talkative with age-appropriate tendencies to get distracted. T.D. is able to engage and articulate age-appropriate rationale to support his stated positions though the Guardian ultimately has concluded T.D. has not attained an age and sufficient maturity for his objections to repatriation to be the sole basis for denying a return order. Michel would disagree and believes the Court will also conclude otherwise after having the opportunity to interview T.D. as to his objections to returning to Hong Kong.

T.D. has expressed to the Guardian myriad reasons for his uninfluenced and unwavering objection to repatriation. As to the political climate and civil unrest in Hong Kong, T.D. explained his understanding that there are communist in

China who shoot people. People are too scared to protest in Hong Kong because communists have taken them away. T.D. referenced a Hong Kong news video he described as scary wherein a teenager was going to shop and was tackled and stopped by the police. T.D. watched the news in Hong Kong and has been shown videos by both his parents. T.D. has expressed concerns that the communists in Hong Kong might lock it down like in Russia and that China stops people from leaving. T.D. believes it is possible that he could get stuck in Hong Kong and does not want this to happen. T.D. has also stated there is no freedom of speech in Hong Kong and expressed concern that one could go to jail in the future for something they said in the past. He was aware of a doctor who spoke up about Covid and subsequently disappeared.

In addition to the aforementioned deeply held concerns about the deteriorating situation in Hong Kong, T.D. has also

expressed to the Guardian more generalized preferences substantiating his desires to remain in the United States including language barriers in Hong Kong where he states Chinese is spoken rather than English, his first language. T.D. believes this has impeded his ability to make friends in Hong Kong. T.D. prefers that the United States is open and spread out and that he does not have to share living space with his sister. T.D. also disliked the weather in Hong Kong, that toys were more expensive, and expressed excitement about opportunities in the United States for participation in extra-curricular athletics.

The Court will also hear from Michel as to children's level of intelligence and maturity and uninfluenced objections to returning to Hong Kong. Michel believes the children, particularly T.D., is capable of forming his own opinions and attitudes about where T.D. wishes to live and why he objects to returning to Hong Kong. T.D. has reached

an age and level of maturity such that his wishes and specifically, his objections to being returned to Hong Kong, should be taken into account by the Court to preclude repatriation.

Historically, the children have been encouraged to be liberal-minded, critical-thinking individuals. The children, who have traveled throughout Asia, Europe, and the United States, are highly intelligent and recognized as such by their teachers, social workers, and peers in the United States (often with Michel alone, but almost never with Wan alone outside Hong Kong and nearby Macau). T.D. currently tests at the top of his class in reading and mathematics. Outside the classroom, both parents have shared with the children their anti-government views relating to China. Both parents have exposed the children to current events including the ongoing and intensifying social and political unrest in Hong

Kong. Knowledge of these events have, in part, informed the children's, specifically T.D.'s, objections to repatriation.

T.D. is more than capable of differentiating between the truth and a falsehood. T.D. is keenly aware of the litigation, his circumstances, and the seriousness of what is at stake in this matter having been interviewed by the Guardian, and two other experts during this proceeding.

T.D. has unequivocally expressed to Michel and others his objections to returning to Hong Kong and his desire to remain in the United States. So strong are T.D.'s objections that T.D. has expressed to Michel he did not want to be alive responding at the prospect of having to return to Hong Kong. T.D. has formed this strongly held position free of any influence from Michel and has articulated particularized and rational bases for his position.

While Michel has sought to allow the children the freedom to have and express their independent opinions as

to where they will live, Michel believes (documented in part by statements made by the children themselves) both children have been subject to a withering psychological assault (augmented by physical discipline) by Wan over many months in an attempt to persuade them to change their views against returning to Hong Kong. These tactics include (i) Wan's constant denigration of Michel, his family, the schools in Illinois, the children's friends in Illinois, (ii) physical discipline by Wan when the children have expressed preferences of which she does not approve, (iii) Wan selectively disclosing facts about the case to the children, and (iv) Wan showing the children (and giving her unrebutted interpretation of) messages sent by Michel in relation to this case.  Despite all of this, T.D. has expressed a clear and unwavering preference of not returning to Hong Kong.

It is clear to T.D. that a return to Hong Kong would require him to live with Wan while Michel remained in Illinois as Michel believes it would be unsafe for him to return to Hong Kong. T.D. does not want to be separated from his father, the children's primary care giver since 2015, even if regular visitation could be arranged. T.D. has expressed similar concerns about leaving grandparents, aunts, uncles, and cousins in Illinois.  T.D. has voiced his concern about physical discipline by Wan if he were to be returned to Hong Kong without Michel to intervene when Wan grows impatient and angry.

Further fueling T.D.'s objections is his understanding from Wan since at least December 2020 that T.D. will likely be held back in school should he be required to return to Hong Kong causing the child exceptional distress. Such a reality would be traumatic for T.D. both academically and socially particularly where T.D. is now at the top of his class

and is able to assimilate socially without the language barriers existing in Hong Kong. T.D. is excited about the social, curricular, and extra-curricular activities available to him in the United States. Both children have quickly adjusted to their school and home.

T.D. has also expressed to Michel significant fears about returning to Hong Kong given the deteriorating social and political situation in Hong Kong. These significant objections voiced to Michel by T.D. are consistent with the concerns stated by T.D. to the Guardian as well as Michel's expert Dr. Alan M. Jaffe.

This Court will hear from Dr. Alan M. Jaffe, who T.D. informed of his objection to returning to Hong Kong and his desire to remain in the United States. With respect to T.D.'s level of maturity, even Wan described T.D. to Dr. Jaffe has open, honest, stubborn, and holding strong opinions.

T.D. discussed with Dr. Jaffe his strong opinions concerning the situation in China and Hong Kong and his awareness of current events from both family and the news. As with the Guardian, T.D. referenced the protests in Hong Kong, China taking away freedoms of speech, as well as specific incidents involving people who have disappeared, been shot, or have gone to jail for speaking out against China or doing things the Chinese Government did not like. T.D. expressed to Dr. Jaffe his understanding about the dangers of talking about communists outside his home and his feeling that friends in Hong Kong could not be trusted with such subjects.

As this Court will observe, T.D. is a bright, mature, and inciteful young man. He has significant and real fears about returning to Hong Kong which he has unequivocally and consistently voiced. His objections to repatriation include a fear that his family life will be upended as he will be taken

from the custody of his father and forced to leave family and friends in the United States. T.D. views his future as backwards moving in Hong Kong where he has difficulty with the language, making friends, and may be further stifled by having to repeat the fifth grade.

However, it is not just these obstacles in Hong Kong or his concerns about space and weather that cause T.D. to object to repatriation. T.D. is aware of the deteriorating situation in Hong Kong. He is a young person with liberal views and ideas about communism and freedoms learned from his parents throughout his life. T.D. is exposed to the news and his parents have discussed the concerning situation in Hong Kong and the dangers of even speaking with friends about his beliefs. T.D. does not wish to return to such an environment.

T.D. has reached an age and level of maturity. His voice which is free from undue influence—at least on the part of

Michel. As such, T.D.'s decisive, consistent, and well-reasoned objections to repatriation should be considered by this Court to preclude an order requiring either T.D. or his sister to be returned to Hong Kong.

## V.   THE RETURN OF THE CHILDREN TO HONG KONG WOULD OFFEND THE UNITED STATES' FUNDAMENTAL PRINCIPLES RELATING TO THE PROTECTION OF HUMAN RIGHTS AND FUNDAMENTAL FREEDOMS.

Article 20 of the Convention provides as follows:

> The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.

This provision was intended to address "the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." U.S. State Department Text & Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986).   A claim under this provision first must be assessed in the context of the country

where the child currently resides. That is, if a child in the United States is the subject of a return application, U.S. values regarding human rights and fundamental freedoms are the measure by which the facts are judged. In addition, those "fundamental principles" must be applied without discrimination in the requested state. *Id.*

As thoroughly outlined above, and as will be demonstrated at trial, the protection of human rights and fundamental freedoms are things of the past in Hong Kong, and the children, upon return, will be deprived of the fundamental freedoms enshrined in our First Amendment which they currently enjoy. The fact that our government has determined that human rights situation in Hong Kong had eroded to the point where it will no longer extradite adult fugitive offenders and prisoners to Hong Kong should provide a clear message to this Court that extraditing two

minor children there would be nothing short of unconscionable.[23]

## VI.   IN LIGHT OF ITS ASSIMILATION INTO CHINA, HONG KONG CAN NO LONGER BE CONSIDERED A SIGNATORY TO THE HAGUE CONVENTION.

As set forth in Michel's Motion to Dismiss, the Hong Kong Special Administrative Region of the People's Republic of China ("Hong Kong"), which became a signatory to the Convention on September 1, 1997, can no longer be considered a signatory to the Convention.

Article 35 of the Convention states that the "Convention shall apply as between Contracting States ***[.]" Convention, art. 35. As explained by the Second Circuit in *U.S. v. Amer*, 110 F. 3d 873, 881 (2d Cir. 1997),

---

[23] Exec. Order No. 13936, 85 Fed. Reg. 43413 (July 17, 2020) (available                                                                          at https://www.federalregister.gov/documents/2020/07/17/2020-15646/the-presidents-executive-order-on-hong-kong-normalization).

"The Hague Convention's mechanisms are triggered \*\*\* only when both the country to which the child is abducted and the country from which they are taken are parties to the Convention. As Article 35 plainly states, 'This Convention shall apply as between Contracting States....' *See also* Hague Convention, Art. 1 (object of Convention is to 'ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States'). This requirement that both the 'left-behind' and the 'retaining' countries are signatories to the Convention is also implicit in its very operation. Because the Convention functions solely through the designated Central Authorities in the respective states, and because only contracting parties will have designated such authorities, the Convention can operate only between two signatory states. (Citations omitted.)"

*Amer*, 110 F. 3d at 881.

Relief under the Convention cannot be obtained where, as is the case here, Hong Kong can no longer be considered a signatory to the Convention.

While it is anticipated that Wan will argue, via her rebuttal expert, that Hong Kong courts continue to vigorously enforce the Hague Convention, her expert's opinion on the subject (a) fails to cite a single case enforcing the convention subsequent to the passage of the NSL, (b) makes no mention of the fact that Hong Kong's Secretary of Justice, Teresa Cheng—the individual charged with enforcing the convention—is currently subject to U.S. sanctions for her role in undermining Hong Kong's autonomy,[24] and (c) fails to acknowledge the Hong Kong judiciary's admitted inability to reconcile the NSL with Hong Kong's other treaty commitments.[25]

As will be established by the testimony of Dr. Phil C.W. Chan, Michel's expert, the Convention ceased to be binding

---

[24] https://www.federalregister.gov/documents/2020/07/17/2020-15646/the-presidents-executive-order-on-hong-kong-normalization
[25] See *fn. 10*, *supra*.

and operative between the United States and Hong Kong. Accordingly, Wan it not entitled to any relief under the Convention.

On July 1, 1997, pursuant to the Joint Declaration of the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the People's Republic of China ("Sino-British Joint Declaration"), the United Kingdom's sovereignty over Hong Kong ceased and Hong Kong was reverted to China as a special administrative region of China.

Under Article 31 of the 1982 Constitution of China, the Basic Law of Hong Kong was promulgated by the National People's Congress which took effect on July 1, 1997. Pursuant to Article 13 of the Basic Law of Hong Kong, Hong Kong does not have independent capacity to partake in defense or in foreign affairs. As Hong Kong is not a state and is part of China, it does not have the legal capacity under

international law to enter into or remain a "signatory" to any treaty independent of China. Thus, under international law and the laws of Hong Kong and of China, Hong Kong is not an independent state and does not have the legal capacity to enter into a multilateral treaty such as the Hague Convention. The foreign affairs of Hong Kong are the responsibility of the Central People's Government in Beijing, China. Hong Kong is a "signatory" to the Hague Convention only insofar as China had agreed to continue the United Kingdom's extension of its ratification of the Convention to Hong Kong as of July 1, 1997, when Hong Kong reverted to China's sovereignty. As China has not ratified the Hague Convention and is able at any time to modify or withdraw its agreement to continue the United Kingdom's extension of its ratification of the Convention to Hong Kong, there lacks formal and manifest reciprocity in respect of the Convention between the United States and Hong Kong *inter se*.

3233-SEM-TSH

In addition to there being no reciprocity between the United States and Hong Kong, following China's announcement on May 22, 2020 of the imposition of a National Security Law on Hong Kong, United States Secretary of State Mike Pompeo on May 27, 2020, certified to the United States Congress pursuant to sections 205 and 301 of the United States–Hong Kong Policy Act of 1992 that, *inter alia*, "Hong Kong does not continue to warrant treatment under United States laws in the same manner as U.S. laws were applied to Hong Kong before July 1997."

Thereafter, on July 14, 2020, by Executive Order 13936 of July 14, 2020, entitled "The President's Executive Order on Hong Kong Normalization", United States President Donald J. Trump suspended various bilateral policy agreements the United States had reached with Hong Kong and stated:

> "Under this law [China's National Security Law for Hong Kong], the people

of Hong Kong may face life in prison for what China considers to be acts of secession or subversion of state power – which may include acts like last year's widespread anti-government protests. The right to trial by jury may be suspended. Proceedings may be conducted in secret. China has given itself broad power to initiate and control the prosecutions of the people of Hong Kong through the new Office for Safeguarding National Security.
***
I therefore determine that the situation with respect to Hong Kong, including recent actions taken by the PRC [People's Republic of China] to fundamentally undermine Hong Kong's autonomy, constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. I hereby declare a national emergency with respect to that threat."

By virtue of Executive Order 13936 of July 14, 2020 and given Hong Kong's lack of capacity to enter into any treaty independent of China, the Hague Convention has ceased to be binding and operative between the United States and

Hong Kong. The non-inclusion of the Hague Convention in the list of bilateral policy agreements the United States had reached with Hong Kong and has now specifically suspended under Executive Order 13936 of July 14, 2020, is not dispositive in determining the question of whether the Hague Convention has ceased to be binding and operative between the United States and Hong Kong by virtue of the same Executive Order. This is a question is a question of law and not a nonjusticiable political question.

## **CONCLUSION**

For the foregoing reasons, Respondent, Michel Debolt, asks that this Court deny the relief sought in Wan's Petition.

**BEERMANN LLP**

Attorneys for Respondent

/s/ *Matthew D. Elster*

Shana L. Vitek
Howard A. London
Matthew D. Elster
**BEERMANN LLP**
*Attorneys for Respondent*
161 North Clark Street, Suite 3000
Chicago, Illinois 60601
Tel:  (312) 621-9700
Email:  mdelster@beermannlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of March, 2021, a copy of the attached document was filed via the court's CM/ECF system, which will send electronic notice to all counsel of record who have appeared in this case.

<u>/s/ *Matthew D. Elster*</u>