# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **CHUNG CHUI WAN** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 20-cv-3233** |
| | ) | |
| **MICHEL DALE DEBOLT** | ) | |
| | ) | |
| **Respondent.** | ) | |

## OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. District Judge:**

Petitioner Chung Chui Wan brings this action for the return of her two children, a 10-year-old son ("T.D.") and 8-year-old daughter ("A.D.") to Hong Kong under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), October 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.* Petitioner claims that the children's father, Respondent Michel Dale Debolt, wrongfully retained the children in the United States in violation of the Hague Convention and ICARA. Respondent asserts three affirmative defenses: the "age and maturity" exception, the "grave risk"

exception, and the Article 20 exception.  The Court held a bench trial that lasted several days, and the parties submitted closing arguments via written briefs to support their positions.  For the reasons stated below, the Court GRANTS the Petition.

## I. APPLICABILITY OF HAGUE CONVENTION

At the inception of this case, Defendant filed a motion to dismiss the petition arguing that the Hague Convention does not apply to Hong Kong.  <u>See</u> Motion to Dismiss, d/e 14.  The Court denied Respondent's motion to dismiss and found that Hong Kong is still a signatory to the Hague Convention under the laws of the United States.  <u>See</u> Opinion, d/e 24.  Respondent again raised the issue at the bench trial.  No convincing evidence has been presented that Hong Kong does not consider itself a signatory to the Hague Convention or that the United States views Hong Kong in such a way.  The Court finds credible Petitioner's expert witness, Azan Aziz Marwah, a barrister in Hong Kong, who testified at the bench trial that Hong Kong is still a signatory to the Hague Convention, which is based on Mr. Marwah's involvement in Hague Convention cases in Hong Kong.  <u>See</u> Mr. Marwah's Report, Petitioner's Exhibit PX80, pp. 5-6 ("Therefore, I can confirm from

basic principles of Hong Kong law, direct experience, and by reference to numerous recent cases: the Hague Convention applies to Hong Kong and has been / is being implemented here, especially in relation to requests for return of children to the United States. See e.g. BMC v BGC formerly known as WCY [2020] HKCFI 222; LCYP v JEK [2015] HKCA 407, [2015] 4 HKLRD 798, [2015] 5 HKC 293; and BLW v BWL [2007] 2 HKLRD 193.").  The testimony and written report of Respondent's Hong Kong expert, Dr. Phil C.W. Chan, does not sway this Court to reverse its previous determination on this issue. Therefore, the Court's finding stands that Hong Kong is a signatory to the Hague Convention and is bound by the Hague Convention and ICARA.

## II. FINDINGS OF FACT

### A. Evidence Admitted at Trial

Petitioner was born in Beijing and grew up in Hong Kong, where she is a permanent resident.  She also has citizenship in the United Kingdom.  Respondent was born and raised in the United States and also has citizenship in the United Kingdom.  Petitioner and Respondent met while they were working in London.  The two married in Barbados in 2008.  In 2010, while Petitioner was

pregnant with T.D., Petitioner and Respondent decided to move to Hong Kong. Both T.D. and A.D. were born in Hong Kong and are citizens of Hong Kong, the United Kingdom, and the United States.

For a period of time, Petitioner stayed at home with the children. Respondent worked at a law firm in Hong Kong where he worked long hours. However, in 2015, Respondent ceased worked for the law firm. He never regained stable employment in Hong Kong. Petitioner transitioned to working full-time and covered the household expenses. Respondent's dislike of living in Hong Kong grew. Petitioner and Respondent discussed the prospect of moving to the United States, including living in Los Angeles, New York, and Denver.

In more recent years, Petitioner and Respondent had marital issues. For a short time in 2019, the relationship improved. However, by 2020, the two were sleeping separately and fought often. In fact, Respondent started secretly recording Petitioner.

In early 2020, COVID-19 arrived in Hong Kong and other parts of the world. By February 2020, the schools in Hong Kong closed. At that time, Respondent was on a ski trip in the United States, and Petitioner and Respondent decided that Petitioner and the children

should join Respondent in the United States for a short while.

When the children arrived in the United States in February 2020,

Respondent enrolled the children at a school in Central Illinois near

Respondent's hometown. The children attended the school for

several days before the school closed due to COVID-19. The family

returned to Hong Kong. The schools in Hong Kong eventually

opened in spring 2020, and the children completed the school term

in Hong Kong.

After the school year ended in 2020, Respondent asked

Petitioner to travel with the children to Respondent's hometown in

the United States – Shelby County, Illinois – for a summer vacation.

On July 18, 2020, Respondent traveled with the children to Shelby

County, Illinois, from Hong Kong. Petitioner understood that

Respondent and the children would return to Hong Kong August

17, 2020. While in the United States, Respondent told Petitioner

that he would return with the children on August 17, 2020.

However, once in the United States with the children, Respondent

suggested he keep the children in the United States. Petitioner

disagreed. On August 7, 2020, Petitioner asked about the plan for

the children to return, and Respondent stated that the children

were not returning but, instead, remaining in the United States. Petitioner voiced her objection and asked for the children to return home.  On August 16, 2020, Petitioner told Respondent that if he did not return home with the children, Petitioner would take legal action.  On August 12, 2020, Respondent filed a petition for dissolution of marriage in Shelby County, Illinois, Circuit Court. On August 17, 2020, Respondent stated that he would return home with the children and Respondent sent a photograph of the children's return flight tickets for August 19, 2020.

Respondent did not return to Hong Kong with the children on August 19, 2020.  Instead, the children have remained in the United States since that time.  Moreover, on August 19, 2020, Petitioner received a copy of a summons and a Petition for Dissolution of Marriage that was signed by Respondent on August 12, 2020, and filed on August 17, 2020, in Shelby County, Illinois. The children began school at Stewardson-Strasburg Elementary School in Shelby County, Illinois on August 19, 2020.  T.D. is in 5th grade, and A.D. is in 3rd grade.

The parties presented a great deal of testimony as to the role each parent played with the children while in Hong Kong.

Petitioner works full-time and sometimes comes home in the evening. While the children lived in Hong Kong, on the weekends, Petitioner took the children to activities, including the beach, rugby practice and games, swim lessons, and playdates. The children attended S.K.H. Wei Lun Primary School in Hong Kong. Classes were taught in Cantonese. Both parents testified that the children have some difficulties reading and speaking Cantonese. Petitioner lives close to her brother, Ching Wan, and her mother in Discovery Bay, Hong Kong. Her brother and his wife have children near the ages of T.D. and A.D. Petitioner also has good relationships with the parents of T.D. and A.D.'s friends in Hong Kong, two of whom were called to testify on behalf of Petitioner – Robert Lustberg (friend) and Lynn Chan (friend). Both testified that Petitioner arranged playdates for the children and that Petitioner had a good relationship with her children.

Between 2015 and 2020, even though Respondent was not working, he was not the primary caretaker of the children. The parents employed an in-home helper who worked six days a week Monday through Saturday, but not Sunday. Respondent spent time with the children after school and on weekends, but he often

stayed in his study away from the children.  Respondent scheduled medical appointments if the medical office spoke English. Respondent walked the children to and from school.  For medical specialty appointments, Petitioner made the appointments. Petitioner often scheduled the playdates for the children and planned weekend activities.  In large part, the household work was completed by the in-home helper and Petitioner.  A.D. reported to Dr. Robert Shapiro, Petitioner's psychology expert, that Petitioner mostly took care of the children.  See Dr. Shapiro Report, Petitioner's Exhibit PX79, p. 15.  The children also stated that Petitioner, Respondent, Petitioner's brother, and Petitioner's mother helped the children with their homework in Hong Kong.  See id. Clearly, both Petitioner and Respondent took care of the children.

Several witnesses testified that Discovery Bay is a safe and affluent area.  See Dr. Marwah Report, Petitioner's Exhibit PX80, p. 14 ("It is an affluent area that has a higher population of non-Chinese, European and Antipodean (e.g. Australian, New Zealander) residents.  It is a very safe community in which there is almost no violent crime. It contains restaurants, schools, playing fields, beaches, and a residents' club among other amenities. It is a

spacious area with wide roads and larger apartments than are normally found in Hong Kong. There are a number of hiking trails nearby. It is well known as a good environment for children, similar to growing up in a village in Australia, the US[,] or England."); <u>see also</u> Testimony of Robert Lustberg, Lynn Chan, and Ching Wan.

While in Hong Kong, the children lived busy lives.  They went to school and worked on schoolwork during the week.  Petitioner's brother helped the children with their Cantonese homework. Respondent read to the children in English and has continued to do so while the children are in the United States.  The children each had a small group of friends and had play dates on the weekends. The children participated in rugby, baseball, and swimming.

Since being in the United States, the children have been attending school in-person at Stewardson-Strasburg Elementary School in Shelby County, Illinois.[1]  The courses are all taught in

---

[1] During the bench trial, Respondent was evasive when answering questions about where Respondent and the children have lived since retaining the children in the United States.  Moreover, Respondent testified, and the evidence shows, that Respondent told the Stewardson-Strasburg Elementary School administration that the children were living in an AirBnB, which was inaccurate as they were living at Respondent's aunt's home.  Such statement deemed the children "homeless," which allowed the children to live outside of the school district but be treated as in district.  <u>See</u> Emails with School Principle, Petitioner's Exhibit PX145, p. 1.

English. According to Respondent, due to the COVID-19 pandemic, the children have been unable to start any sports. Respondent and the children live near Respondent's relatives, including cousins near the children's ages.

During the initial meetings with the GAL in October and November 2020, both T.D. and A.D. expressed the desire not to live in Hong Kong. T.D. stated that he did not like Hong Kong because he did not like sharing the living space with his sister, he has difficulties reading, writing, and speaking Cantonese, the toys were expensive in Hong Kong, the baseball team is boring, and it is more congested in Hong Kong than in the United States. A.D. expressed that she missed her friends, her mom, and her stuffed toys in Hong Kong. She said that she would like to live in Canada because she likes seafood and wants to get a Husky dog, which needs a cold place to live. Both of the children expressed concerns about China exerting control over Hong Kong. Petitioner and Respondent were both responsible for the information shared with the children as both shared videos and information with the children.

The GAL also met with the children's teacher. T.D.'s teacher stated that T.D. is very intelligent and tested the highest in the

class for reading and math.  However, T.D. showed some immaturity at the beginning of the school year because he would flap his arms and spin around in class.  T.D. has now settled into the classroom and no longer exhibits that behavior.  The teacher said T.D. was socially fine but quiet.   His teacher said overall that T.D. is likely academically ahead of his peers, but socially he is a little below for a child his grade level.  A.D.'s teacher described A.D. as very intelligent, but socially A.D. may be at or below normal for a 3rd grader.  The teacher described A.D. as quiet but a happy child.

The GAL prepared an initial report for the Court finding that both children "have not attained the age and sufficient maturity where it would be appropriate for the court to consider [T.D. or A.D.'s] opinions as a deciding factor in this case."  See First Report, d/e 37, p. 29.

The GAL prepared a second and third report for the Court.  In the third report, the GAL described concerning behavior from T.D., which prompted the GAL to meet with the children again.  Starting in December 2020, T.D. would have fits of screaming, yelling he hates himself, hurting himself, and stating he did not want to live.  T.D. exhibited this behavior while with Respondent, who then

reported it to the GAL. T.D. told the GAL that T.D. got upset because he was in a bad mood due to lack of sleep, was annoyed by his sister, and his mother called too much. Respondent also testified that on one night, T.D. left the house as if to run away. Respondent found T.D. near the cornfield without a coat and shoes. T.D. received some counseling by agreement of both parents. However, T.D. has not regularly received counseling.

During a meeting with A.D. in March 2021, A.D. told the GAL that she wanted to live in Hong Kong because of her friends, her mom, her family, and her toys. In the GAL's third report, the GAL's opinion about the children's age and maturity remained the same in that the children were not of sufficient age and maturity for the Court to consider their opinions. See Third Report, d/e 97, p. 13.

Based on the evidence presented, the children have not acclimated to the United States better than in Hong Kong. The reports from the children's teachers indicate that the children do not have many friends in school. At the time of the bench trial, the children had not yet participated in any sport. T.D. had also started exhibiting new emotional and physical outbursts.

T.D. and A.D. told the GAL that Respondent told the children that Respondent would never go back to Hong Kong. A.D. reported that Respondent told A.D. that Respondent cannot go back to Hong Kong because it is dangerous for him to return. Neither child reported that Petitioner had told the children whether she could or would live in the United States. Based on the information provided to the Court, Respondent's decision not to return to Hong Kong is a voluntary decision based on personal preference.

Respondent testified that he feels Petitioner's drinking is a risk to the children. He raised a few instances where Petitioner was intoxicated or drinking around the children. On one occasion, Petitioner was staying at a hotel with the children. She left the children in the hotel room adjacent to a room where relatives were staying while she was having drinks at the hotel bar with a friend. Another occasion involved Petitioner coming home after drinking and reprimanding T.D about eating a banana and spanking him. Nonetheless, the evidence did not show that Petitioner has a drinking problem. Instead, her drinking was limited to social settings and did not interfere with her parenting of T.D. and A.D.

Moreover, Petitioner and Respondent both used corporal punishment with their children while they lived in Hong Kong and since the children have been in the United States.  Respondent audio recorded two instances of Petitioner using corporal punishment – once with A.D. and once with T.D.  Petitioner admitted that she uses corporal punishment.  While Respondent tried to paint a different picture of his punishment of the children, he also uses corporal punishment with the children and admitted occasions where he hit the children on their bottoms.

Respondent also testified that he removed the children from Hong Kong because of the political climate, which has had significant changes in the last two years.  Hong Kong is a special administrative region of the People's Republic of China.  In 1997, Britain transferred Hong Kong to China.  China declared that Hong Kong will enjoy freedom under the basic Law for 50 years after the transfer from Britain pursuant to the 1984 Joint Declaration on the Question of Hong Kong.  Hong Kong maintains separate governing and economic systems from mainland China under the principle of one country, two systems.

In 2019, large-scale protests began in Hong Kong, which climaxed in the summer and fall of 2019, and continued into 2020. On June 30, 2020, China's National People's Congress Standard Committee passed the National Security Law (NSL) for Hong Kong. On the same day, the Chief Executive of Hong Kong implemented the NSL in Hong Kong.  The NSL is seen as a response to calm the protests and create stability in Hong Kong.  Opponents of the NSL argue that the NSL undermines the Basic Law and the one country, two systems guarantee.

The NSL has promulgated new legislation and rules in Hong Kong, including new requirements in schools to teach the NSL and the creation of an anonymous NSL tip hotline.  Some reports indicate that video cameras may be required in the classrooms. However, that is uncertain.  While it appears an individual could be prosecuted in Hong Kong for making anti-communist remarks, evidence was presented that arrests of normal citizens for expressing their political views are not widespread, and many anti-communist posters hang in parts of Hong Kong.

Moreover, the children are not politically engaged in Hong Kong.  The Court was not presented with any evidence that the

children have engaged in public dissemination of anti-communist
information or speech.  Petitioner herself attended but one protest
in 2019.  Otherwise, Petitioner and Respondent have not engaged in
public dissemination of anti-communist information or speech.
However, Respondent argues that WhatsApp communications are
monitored by China and Petitioner has expressed opinions in the
WhatsApp messages.  No evidence was presented in support of such
monitoring.  And while Respondent's Hong Kong expert, Dr. Chan,
suggests that a child could be bullied by another child using the
NSL hotline, the Court was not presented with any evidence that
such a situation has happened in Hong Kong or that the children
face such risk.

Furthermore, Hong Kong has not restricted Hong Kong
residents from leaving Hong Kong, and Hong Kong residents may
still come and go from the country.  Some restrictions are in place
due to COVID-19, such as travel from the United Kingdom to Hong
Kong.  See Mr. Marwah Report, Petitioner's Exhibit PX80, p. 7 ("The
ban is also (now) limited to those [travelers] who have visited the
United Kingdom within the previous 21 days . . . . The effect of
these measures was simply to require Hong Kong residents to

spend a number of days in a 'third-party country' before entering

Hong Kong.").  Based on the laws currently in place in Hong Kong,

Petitioner, Respondent, and the children do not face a danger of

being arbitrarily detained.   The evidence also does not show that

the children are at risk of being prosecuted or arrested under the

National Security Law if they return to Hong Kong.

  In theory, the NSL could threaten the Basic Law of Hong Kong.

At this time, the effects of the NSL are unknown.  The evidence

presented does not show that the Basic Law has ceased to exist.

Evidence submitted by Respondent notes that Hong Kong's highest

court held on February 9, 2021, that the NSL is not incompatible

with the Basic Law and the Bill of Rights:

> We have decided that there is no power to hold any
> provision of the NSL to be unconstitutional or invalid as
> incompatible with the Basic Law and Bill of Rights.
> However, that is not at all to say that human rights and
> freedoms and rule of law values are inapplicable. On the
> contrary, NSL 4 and NSL expressly stipulate that those
> rights, freedoms and values are to be protected and
> adhered to in applying the NSL. They provide the context
> in which NSL 42(2) must be construed and applied. As
> far as possible, NSL 42(2) is to be given a meaning and
> effect compatible with those rights, freedoms and values.
> Save insofar as NSL 42(2) constitutes a specific exception
> thereto, that corpus of law, comprising not only the
> human rights and rule of law principles but also the
> generally applicable HKSAR rules governing the grant or

> refusal of bail is intended to have continued effect in NSL cases. As it was put by this Court in a comparable situation,[37] the specific exception is intended to operate in tandem with constitutional rights and freedoms and other applicable statutory norms as part of a coherent whole.

See Respondent's Exhibit RX195, p. 15 (HKSAR v. Lai Chee Ying, [2021] HKCFA 3).

## B. Expert Opinions

Respondent called two experts to testify at trial to support his affirmative defenses.  The first was Dr. Phil C.W. Chan.  Dr. Phil Chan considers himself a scholar and academic.  In most recent years, Dr. Phil Chan spoke at a few conferences and wrote newspaper or think tank articles.  Respondent classified Dr. Phil Chan as an expert on Hong Kong.  Dr. Phil Chan testified that he received more income as an expert in this case than he has ever received in one year - $85,000.  Dr. Phil Chan opined that there is a grave risk that return of the children from the United States to Hong Kong could expose the children to physical or psychological harm or otherwise place the children in an intolerable position because of the NSL imposed by China.  See Dr. Phil Chan Report, Respondent's Exhibit 120.  Dr. Phil Chan believes that the rule of

law in Hong Kong has effectively collapsed, and Hong Kong is under occupation by China.  The Court finds that Dr. Phil Chan's opinions were highly speculative.

Respondent's second expert was Alan M. Jaffe, Psy.D., a clinical psychologist.  Dr. Jaffe completed psychological testing on Respondent, interviewed Respondent, T.D., and A.D. at separate times, and observed Respondent with the children on one occasion. All interviews were conducted virtually.  During the family observation session, Respondent and the children were watching the Simpsons tv show and barely spoke.  Dr. Jaffe used leading questions when interviewing the children.  For example, Dr. Jaffe directly asked T.D. about the banana incident and whether T.D. witnessed Petitioner drinking.  Sometimes T.D. would directly answer questions, but other times T.D. would avoid answering or his answers were nonresponsive to the question.  Dr. Jaffe also reviewed documents mostly consisting of evidence supporting Respondent's view of the case.

Dr. Jaffe's testimony and opinions often contained hyper technical assumptions and speculation.  Dr. Jaffe's report includes a section on the "Political Situation in Hong Kong" even though he

admitted he is not an expert on Hong Kong.  Dr. Jaffe opined that

"[t]he continuously fluctuating political unrest in Hong Kong makes

it impossible to guarantee the safety of Michel's children should

they return to Hong Kong."  <u>See</u> Dr. Jaffe's Report, Respondent's

Exhibit 62, p. 25.  Dr. Jaffe also opined that Respondent was the

primary caregiver of the children in Hong Kong, which is based on

information only provided by Respondent.  Dr. Jaffe indicates that

the children would be harmed if not in the custody of Respondent

because the children would lack emotional support.  The

information provided by Respondent and the children regarding

Petitioner's treatment of the children seemed exaggerated by Dr.

Jaffe, including the punishment, caregiving, and emotional support

of the children.  Moreover, Dr. Jaffe did not opine on the effect of

Petitioner's drinking.

Petitioner called two rebuttal witnesses to testify at trial.  The

first was Mr. Azan Aziz Marwah, an expert on Hong Kong.  Mr.

Marwah has an impressive resume consisting of scholarly education

and legal experience.  Mr. Marwah disagreed with many of Dr. Phil

Chan's opinions.  Mr. Marwah's opinions were based in reality and

supported by his legal experience and interpretation of the law in

which he practices as a barrister in Hong Kong. See Mr. Marwah's Report, Petitioner's Exhibit PX80. While Mr. Marwah is concerned about the potential impact of the NSL, Mr. Marwah does not believe the children are at grave risk of returning to Hong Kong nor does he think that the political state of Hong Kong is grave. Instead, Mr. Marwah opined that the Basic Law is still intact and the people of Hong Kong enjoy freedom and their human rights.

Petitioner also called Robert B. Shapiro, Ph.D., a forensic psychologist, to testify as a rebuttal expert witness at trial. Dr. Shapiro reviewed numerous documents related to the case, including part of Dr. Jaffe's file, Dr. Jaffe's evaluations of Respondent and the children and psychological testing of Respondent, the GAL report, deposition transcripts of the parties, and Dr. Phil Chan's report. See Dr. Shapiro's Report, Petitioner's Exhibit PX79, p. 3. Dr. Shapiro held an observation session with the children and Petitioner and interviewed Petitioner and the children separately, all of which were conducted in person. Dr. Shapiro also spoke with the GAL by phone and held another interview of Petitioner by zoom. When he interviewed the children, he only asked opened-ended questions unless prompted by a

response.  When T.D. answered Dr. Shapiro's questions, T.D.
provided short responses that seemed age appropriate.  For
example, T.D. said he liked Illinois because the houses are bigger
and everyone speaks English.  However, he complained that there
wasn't enough snow in Illinois.  See Dr. Shapiro's Report,
Petitioner's Exhibit PX79, p. 4.  At trial, Dr. Shapiro testified that
T.D.'s recent outbursts showed T.D.'s immaturity and somewhat
being behind his peers.

Dr. Shapiro's opinions were realistic and balanced.  His report
was factual and considered both sides.  He felt Dr. Jaffe's interviews
with the children contained elements of confirmatory bias.  Dr.
Shapiro opined that the children were not at grave risk, Petitioner
was a good mother, and Petitioner was the primary caregiver for the
children in Hong Kong.  He noted that corporal punishment is not
favored, but that both parents used that form of punishment.
When asked by Dr. Shapiro what beverages the parents drink, the
children did not mention any alcoholic beverage for Petitioner.  Dr.
Shapiro did not find Petitioner's drinking had an impact on the
children.  See Dr. Shapiro's Report, Petitioner's Exhibit PX79, p. 14
("The impact of [Petitioner's] alcohol consumption on the children

seems minimal to none. Similarly, there does not seem to be a significant impact on the children from their mother's discipline.").

The Court finds Petitioner's experts more credible and gives more weight to the opinions of Mr. Marwah and Dr. Shapiro.

### III. CONCLUSIONS OF LAW

Under the Hague Convention, "a child abducted in violation of 'rights of custody' must be returned to the child's country of habitual residence, unless certain exceptions apply.  Abbott v. Abbott, 560 U.S. 1, 5 (2010) (citing Hague Convention, art. 1). However, the Hague Convention provides for certain exceptions for the return of an abducted child.  See Hague Convention, art. 12, 13, 20.   The Hague Convention has two purposes: "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."  Hague Convention, art. 1; see also Garcia v. Pinelo, 808 F.3d 1158, 1162 (7th Cir. 2015).

The Convention "is meant 'to deter parents from absconding with their children and crossing international borders in hopes of obtaining a favorable custody determination in a friendlier

jurisdiction.'" <u>Pinelo</u>, 808 F.3d at 1162 (quoting <u>Walker v. Walker</u>, 701 F.3d 1110, 1116 (7th Cir. 2012)).  The Hague Convention is not meant to settle a custody dispute.  <u>Id.</u>; Hague Convention, art. 19; <u>see</u> <u>also</u> <u>Koch v. Koch</u>, 450 F.3d 703, 711 (7th Cir.2006) (citation omitted) ("An action under the Convention and ICARA is not an action to determine the merits of custody rights.").  Instead, it's meant to "restore the pre-removal status quo." <u>Id.</u>  The child's habitual country is the best to determine issues of custody and access.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Monasky v. Taglieri</u>, 140 S.Ct. 719, 723 (2020).

## A. Petitioner Proved Her Prima Facie Case.

To make a prima facie case for the return of a child under the Hague Convention, Petitioner must establish by a preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning of the Convention."  22 U.S.C. § 9003(e)(1).  Pursuant to the Hague Convention, wrongful removal or retention of a child is defined as:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3.  Therefore, Petitioner must prove by a preponderance of the evidence that: (1) T.D. and A.D. were habitual residents of Hong Kong at the time of their removal by Respondent; (2) Respondent's removal of T.D. and A.D. breached Petitioner's custody rights under the laws of Hong Kong; and (3) Petitioner was exercising her custody rights at the time of the removal.  See id; Abbott v. Abbott, 560 U.S. 1, 8 (2010).

Petitioner and Respondent stipulated that Petitioner has met her burden of proof in establishing her prima facie case.  See Final Pre-Trial Order, d/e 113, p. 3.  The parties agree that the children are both under the age of 16 and habitual residents of Hong Kong. Id. at 3.  The parties also agree that at the time of Respondent's retention of the children in the United States, Petitioner was exercising her custody rights.  Id. at 4.  The Court finds that Petitioner has made a prima facie case warranting return of the children to Hong Kong.

**B. Respondent Failed to Prove the "Age and Maturity" Exception.**

The Hague Convention provides for certain exceptions to returning a child under the Convention.  One such exception is called the "age and maturity" exception, which Respondent has raised.  Pursuant to the Hague Convention, "The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Hague Convention, art. 13.  Whether a child is sufficiently mature is a fact-intensive inquiry and is made on a case-by-case basis.  Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 279 (3d Cir. 2007) ("The Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case-by-case basis."); Simcox v. Simcox, 511 F.3d 594, 604 (7th Cir.2007) ("Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate.").  Moreover, a child's opinion should be more than generalized preferences.  Guerrero v. Oliveros, 119 F. Supp. 3d 894,

915 (N.D. Ill. 2015).  Instead, the child should voice more particular objections.  Id.

Respondent argues that T.D. has reached a sufficient age and maturity for the Court to consider T.D.'s opinions.  He contends that T.D.'s characteristics of independence, good memory, and intelligence show that T.D. is mature.

However, the GAL met with the children on multiple occasions between October 2020 and March 2021 and determined that T.D. has not "attained the age and sufficient maturity where it would be appropriate for the Court to consider his opinions as a deciding factor in this case."  See First GAL Report, d/e 37, p. 30.  In November 2020, T.D.'s teacher told the GAL that T.D. "showed some immaturity at the beginning in that he would flap his arms and spin around the room."  Id. at 25.  However, that behavior stopped.   In March 2021, T.D. started exhibiting other concerning behavior.  T.D. has shown signs of emotional distress, including making statements that he does not want to live, and has physically hurt himself by hitting his head.  One night, T.D. tried to run away into a cornfield without a coat or shoes.

Based on the testimony and reports of the GAL, including interviews with the children's teachers in the United States, and the interviews of the children by the two psychology experts, the Court finds that T.D. is not of sufficient age and maturity for the Court to consider T.D.'s opinions.

Moreover, the opinions of T.D. are generalized preferences, not particularized opinions. See Yang, 499 F.3d at 279 (holding that the ten-year-old girl's preferences for her school, living in a house rather than a small apartment, and having friends and brothers were generalized, not particular, reasons, and, therefore, the exception did not apply).  The Court finds that Respondent has failed to meet his burden of proving by a preponderance of the evidence that the "age and maturity" exception should apply.

**C. Respondent Failed to Prove the "Grave Risk" Exception.**

Respondent's second affirmative defense is that the children are at grave risk of physical or psychological harm if the children return to Hong Kong.

The Hague Convention recognizes an exception to returning a child if the child faces a grave risk of physical or psychological harm or intolerable situation:

> Notwithstanding the provisions of the preceding Article,
> the judicial or administrative authority of the requested
> State is not bound to order the return of the child if the
> person, institution or other body which opposes its
> return establishes that – there is a grave risk that his or
> her return would expose the child to physical or
> psychological harm or otherwise place the child in an
> intolerable situation.

Hague Convention, art. 13(b).  A respondent must prove the grave

risk by clear and convincing evidence.  22 U.S.C. § 9003(e)(2)(A).

What constitutes grave risk is not defined by the Hague

Convention.  Courts have interpreted grave risk to arise in two

situations: "(1) where returning the child means sending him to a

zone of war, famine, or disease; or (2) in cases of serious abuse or

neglect, or extraordinary emotional dependence, when the court in

the country of habitual residence, for whatever reason, may be

incapable or unwilling to give the child adequate protection."

Souratgar v. Lee, 720 F.3d 96, 103 (2d Cir. 2013).  "The potential

harm to the child must be severe, and the [] level of risk and danger

required to trigger this exception has consistently been held to be

very high."  Id.  "The gravity of a risk involves not only the

probability of harm, but also the magnitude of the harm if the

probability materializes."  Norinder v. Fuentes, 657 F.3d 526, 535

(7th Cir.2011); <u>Van De Sande v. Van De Sande</u>, 431 F.3d 567, 570

(7th Cir. 2005); <u>see</u> <u>also</u> Hague Int'l Child Abduction Convention;

Text and Legal Analysis, 51 Fed.Reg. 10494, 10510 (Dep't of State

Mar. 26, 1986) ("Dep't of State Legal Analysis") ("The person

opposing the child's return must show that the risk to the child is

grave, not merely serious.").

Respondent argues two main reasons why the children face a

grave risk of harm if returned to Hong Kong: (1) the political

situation in Hong Kong and (2) Petitioner's physical and emotional

abuse of the children.

Respondent contends that the children face a grave risk of

harm because Hong Kong will not adequately protect the children

after the passage of the NSL.  Moreover, the culture of silence

"represents a psychological war unleashed," and the children will

have to "live under the culture of fear instilled by the NSL."  <u>See</u>

Respondent's Opening Brief, d/e 88, pp. 24-25.  Respondent argues

that the children are at risk of harm because the children "will be

forced to internalize their thoughts and stifle their speech."  <u>Id.</u> at

26.  Respondent contends this will cause psychological trauma

because the children were previously allowed to express their fears.

Respondent bases these arguments on the opinions of his two experts, Dr. Chan and Dr. Jaffe.  However, Mr. Marwah does not believe that the children face a grave risk of harm if returned to Hong Kong because legal protections are still in place and a lot of the concerns raised by Respondent are hypothetical at this point. See Mr. Marwah's Report, Petitioner's Exhibit PX80, p. 13 ("If the children are to live in Discovery Bay, it is my opinion that there is no real and certainly no grave risk that they would be endangered by protests there even if the protests were to restart.").

The articles submitted and arguments made by Respondent are generalized fears and concerns of what might have to Hong Kong or risks that exist for the general public of Hong Kong.  A generalized risk of violence in a country is not enough.  Silverman v. Silverman, 338 F.3d 886, 901 (8th Cir. 2003) ("Rather, the evidence centered on general regional violence, such as suicide bombers, that threaten everyone in Israel. This is not sufficient to establish a "zone of war" which puts the children in "grave risk of physical or psychological harm" under the Convention.").  The harms described by Respondent are not particular to the children in this case. Petitioner and the children are not politically active and outspoken.

Outside of one protest, Petitioner has not engaged in action that subjects her to a realistic and imminent risk of prosecution.  The Court finds that the political climate of Hong Kong does not present a specific grave risk to the children if returned to Hong Kong. See Mendez Lynch v. Mendez Lynch, 220 F.Supp.2d 1347, 1364 (M.D.Fla.2002) (holding that Argentina would still be tolerable for the child even though there was great economic and governmental turmoil in the country).

Respondent next argues that Petitioner's physical and emotional abuse of the children presents a grave risk of harm. Respondent attempted to present evidence, including through his expert Dr. Jaffe, that Petitioner psychologically manipulated and physically abused the children.  The Seventh Circuit has held that "[i]f handing over custody of a child to an abusive parent creates a grave risk of harm to the child, in the sense that the parent may with some nonnegligible probability injure the child, the child should not be handed over[.]"  Van De Sande v. Van De Sande, 431 F.3d 567, 571 (7th Cir.2005).  "To establish the grave risk defense on this basis, there must be evidence that the child will be exposed to frequent and serious domestic abuse."  Guerrero, 119 F. Supp.

3d at 912 (citing <u>Van de Sande v. Van de Sande</u>, 2008 WL 239150, at *10–11 (N.D.Ill. 2008) (finding on remand that the respondent presented "extensive history of serious physical and verbal abuse ... that often played out in front of the children" and that the father made threats to kill the children in the past, which constituted a grave risk to the children).

However, the evidence does not support such allegations in this case. Both parents use corporal punishment with the children, including striking the children on their bottoms. The same is true since the children have been in the United States. The testimony and evidence clearly do not show that Petitioner physically or emotionally abused the children outside of traditional disciplinary measures. Further, the punishment used by Petitioner does not rise to the level of grave risk as contemplated by the Hague Convention. <u>See</u> <u>Guerrero</u>, 119 F. Supp. 3d at 912-13 (finding no evidence of inappropriate "physical contact outside of traditional disciplinary measures" and no police or medical reports documenting abuse, resulting in respondent's failure to prove "some nonnegligible probability" that the petitioner or petitioner's father would injure the child if returned to Mexico). Therefore,

Respondent has failed to prove "some nonnegligible probability" that Petitioner will injure the children if they are returned to Hong Kong. See Van De Sande, 431 F.3d at 571.

Respondent also contends that the children face a grave risk of psychological harm if returned because the children will be removed from Respondent's care, who, according to Respondent, is the primary caregiver. Dr. Jaffe opined that Respondent is the primary caregiver of the children, which is based on information provided by Respondent. Evidence of separation from a parent or adjustment problems in relocating are "inapposite to the 'grave risk' determination." England v. England, 234 F.3d 268, 271 (5th Cir. 2000); see also Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995) ("The district court incorrectly factored the possible separation of the child from his mother in assessing whether the return of the child to Mexico constitutes a grave risk that his return would expose him to physical or psychological harm or otherwise place him in an intolerable situation."). The Hague Convention is not used to litigate the best interests of a child. Dep't of State Legal Analysis, 51 Fed.Reg. at 10510 ("This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the

child's best interests.").  Moreover, the Court has found that both parents cared for the children while in Hong Kong and the children regarded their mother as a substantial caregiver even though she worked full-time.

The Court finds it particularly troubling that T.D. has recently exhibited emotional distress since being in Respondent's care in the United States.  Both Dr. Jaffe and Dr. Shapiro testified that T.D. could be experiencing emotional turmoil due to a loss of a parent. T.D. may feel he has already lost his mother.  Further, the children have not acclimated to the United States as much as Respondent argues.  Petitioner was primarily responsible for organizing the children's activities and social events in Hong Kong.  Petitioner has a good family support system in place in Hong Kong, and the children regularly spent time with Petitioner's brother and mother who helped the children with their homework.

Additionally, Respondent's grave risk argument is essentially based on Respondent's unwillingness to return to Hong Kong. Nothing is preventing Respondent from returning or visiting besides his fear of Hong Kong.  See Pozniak v. Shwartsman, 2021 WL 965238, *12 (E.D.N.Y. 2021) ("Of course, the respondent may

choose to stay in the United States, but that choice would not establish grave risk."); <u>Wtulich v. Filipkowska</u>, 2019 WL 2869056, at *5 (E.D.N.Y. 2019) ("If . . . [the respondent] chooses to stay in the United States rather than care for her daughter in Poland while the authorities there determine the parties' respective custodial rights, the resulting incremental harm to [the child] will flow from [the respondent's] decision rather than [the Court's].").

Lastly, Respondent contends that Petitioner's drinking of alcohol poses a grave risk to the children.  A few instances relating to Petitioner drinking were presented at trial.  However, the Court has found that Petitioner does not have a drinking problem and her drinking is limited to social settings.  Petitioner's alcohol use does not pose a grave risk to the children.

Therefore, Respondent has failed to meet his burden of proving beyond clear and convincing evidence that the children face a grave risk of harm if returned to Hong Kong.

## D. The Article 20 Exception Does Not Apply.

Respondent's last affirmative defense is the exception provided in Article 20 of the Hague Convention.  Article 20 provides: "The return of the child under the provisions of Article 12 may be refused

if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20. The defense "is meant to be 'restrictively interpreted and applied . . . on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process.'" Guerrero, 119 F. Supp. 3d at 916 (quoting Hazbun Escaf v. Rodriquez, 200 F.Supp.2d 603, 614 (E.D.Va.2002); see also Dep't of State Legal Analysis, 51 Fed.Reg. at 10510. A respondent must prove this defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

Article 20 has never been used in a published opinion to prevent the return of children. See Uzoh v. Uzoh, 2012 WL 1565345, at *7 (N.D.Ill. 2012) (noting that the Article 20 exception "has never been asserted successfully in a published opinion in the United States."). This case does not present circumstances that would make it the first.

Respondent portrays a fearful picture of Hong Kong that is riddled with hypotheticals and speculation. China is known for oppressive actions over its citizens, but Hong Kong was meant to have governing autonomy until 2034. The tides are turning in Hong

Kong, but to what degree is unknown.  However, the Court cannot speculate or rule on risks that are not before it.

Respondent argues that returning the children to Hong Kong would "offend the United States' fundamental principles relating to the protection of human rights and fundamental freedoms under Article 20 of the Hague Convention."  See Respondent's Closing Argument Brief, d/e 138, p. 4.  Respondent states that the children will always have to look over their shoulder, that the children are specific targets of the NSL, the NSL will be taught in schools, Hong Kong no longer guarantees individual rights, China's crackdown on dissent poses a threat to the children, and Petitioner's anti-communist actions place the family at risk.  As previously discussed, most of the arguments made by Respondent are generalized fears and not particular risks faced by the children.

Respondent argues that this case is more extraordinary than any other case, but the Court disagrees.  Other courts have assessed the same exception involving countries with more troubling issues. See Guerrero v. Oliveros, 119 F. Supp. 3d 894, 916 (N.D. Ill. 2015) (finding that a comparison of the social conditions, including violence and corruption, in Mexico versus the

United States and that the Mexican laws that do not adequately protect women from domestic and sexual violence are insufficient for the Article 20 exception and reasoning that "[t]he evidence presented by Respondents regarding Mexico's high crime rate and the legal system's inadequacies at protecting women from domestic violence does not meet the 'shocks the conscience' standard required under Article 20" especially in light of the violence in Chicago); Castro v. Martinez, 872 F. Supp. 2d 546, 557 (W.D. Tex. 2012) (holding that Article 20 did not apply in a case where the respondent alleged the child lived in an unsafe area, saw a Mexican police officer arrest and possibly beat an individual, possibly saw his mother engage in sexual intercourse, possibly saw violent acts in Mexico causing him to be obsessed with guns, and lack of health care); Stirzaker v. Beltran, 2010 WL 1418388, at *9 (D. Idaho 2010) (considering whether Article 20 applies where the respondent argued the corruption in Mexico would make it impossible to receive a fair custody trial and held "though the legal systems of the United States and Mexico are different, there has been no evidence that Mexico's system would violate human rights and fundamental freedoms or shock the conscience of the Court.").

Respondent has not presented sufficient evidence that returning the children to Hong Kong would raise "human rights concerns" or "utterly shock the conscious of the court."  This situation certainly does not rise to that level.  See Guerrero, 119 F. Supp. 3d at 916 ("Respondents are essentially asking the Court to use Article 20 to pass judgment on the social and political system of Mexico. However, the Article 20 exception is not to be used 'as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed.'" (quoting Dep't of State Legal Analysis, 51 Fed.Reg. at 10510)).

Therefore, Respondent has failed to prove by clear and convincing evidence that Article 20 exception applies.

**E. An Award of Fees and Costs in Petitioner's Favor Is Required Unless Respondent Proves the Award Would Be "Clearly Inappropriate."**

The Court is required to order Respondent to pay Petitioner's necessary expenses if the Court orders the return of the children, unless an award would be "clearly inappropriate."  Hague Convention, art. 26 ("Upon ordering the return of a child or issuing an order concerning rights of access under this Convention,

the judicial or administrative authorities may, where appropriate, direct the person who removed or retained the child, or who prevented the exercise of rights of access, to pay necessary expenses incurred by or on behalf of the applicant, including travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child."). ICARA specifically provides for an award of fees and costs to prevailing parties:

> Any court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

22 U.S.C. § 9007(b)(3).

Petitioner seeks "an Order requiring Respondent to pay Petitioner's expenses and costs, including transportation costs, housing costs, etc. and Petitioner's attorney fees." See Petitioner, d/e 1, pp. 11-12.

Petitioner has 14 days from the entry of this Opinion to file a motion and supporting evidence of her reasonable and necessary

expenses, including evidence of attorney's hours and rates. Respondent has 14 days from the filing of Petitioner's motion to file a response providing any argument as to why an award of necessary expenses would be inappropriate under these circumstances.

## IV. CONCLUSION

This Court takes this case and this decision very seriously. The children have been immensely impacted by Respondent's willful decision to disobey his agreement with Petitioner and, in the face of Petitioner's objection, unilaterally decide to retain the children in the United States. The psychological effects on the children have already surfaced. The Court is bound by the Hague Convention and ICARA and must adhere to the laws before it. The Court hopes that upon return of the children, Petitioner and Respondent will work together to best provide for their children.

For the foregoing reasons, the Court finds that Respondent wrongfully retained the children in the United States and Respondent has failed to establish any affirmative defense to the return of the children. Therefore, the Court GRANTS Petitioner's

Petition (d/e 1) and the children must be returned to Hong Kong.  A

separate order will be entered detailing the return of the children.

**ENTERED: May 3, 2021**

**FOR THE COURT:**

_s/ Sue E. Myerscough_

**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**